In re THE WALT DISNEY COMPANY DERIVATIVE LITIGATION

C.A. No. 15452.

Court of Chancery of Delaware, New Castle County.

Submitted March 6, 2003.
Decided May 28, 2003.

276

Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Steven G. Schulman, U. Seth Ottensoser and Seth D. Rigrodsky, of Milberg Weiss Bershad Hynes & Lerach LLP, New York, New York, for Plaintiffs, of counsel.

David C. McBride and Christian Douglas Wright, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Ronald L. Olson, George M. Garvey, Mark H. Epstein and Jason L. Haas, of Munger, Tolles & Olson LLP, Los Angeles, California, for Defendant Michael S. Ovitz, of counsel.

Joel Friedlander, of Bouchard, Margules & Friedlander, Wilmington, Delaware, for The Walt Disney Company.

R. Franklin Balotti and Anne C. Foster, of Richards, Layton & Finger, Wilmington, Delaware, for Director Defendants.

### *MEMORANDUM OPINION*

CHANDLER, Chancellor.

In this derivative action filed on behalf of nominal defendant Walt Disney Company, plaintiffs allege that the defendant directors breached their fiduciary duties when they blindly approved an employment agreement with defendant Michael Ovitz and then, again without any review or deliberation, ignored defendant Michael Eisner's dealings with Ovitz regarding his

non-fault termination. Plaintiffs seek rescission and/or money damages from defendants and Ovitz, or compensation for damages allegedly sustained by Disney and disgorgement of Ovitz's unjust enrichment.

The matter is now before the Court in a somewhat unusual posture. Defendants moved to dismiss plaintiffs' second amended derivative complaint (hereinafter the "new complaint") pursuant to Court of Chancery Rules 12(b)(6) and 23.1. Because defendants relied on certain documents (not incorporated by reference in plaintiffs' new complaint) in seeking dismissal of the new complaint, the Court converted the motions into summary judgment motions and afforded plaintiffs an opportunity to undertake discovery. Defendants promptly moved to reargue the Court's decision to convert the motions into summary judgment motions, offering to excise from the briefs all references to the disputed documents. I denied defendants' request for reargument.[1] Although the motions before me now have technically been converted to summary judgment motions, out of an abundance of caution the Court nevertheless will treat them as motions to dismiss, and address their merits without considering references to, or the contents of, the disputed documents.

As will be explained in greater detail below, I conclude that plaintiffs' new complaint sufficiently pleads a breach of fiduciary duty by the Old and the New Disney Board of Directors[2] so as to withstand a motion to dismiss under Chancery Rules 23.1 and 12(b)(6). Stated briefly, plaintiffs' new allegations give rise to a cognizable question whether the defendant directors of the Walt Disney Company should be held personally liable to the corporation for a knowing or intentional lack of due care in the directors' decision-making process regarding Ovitz's employment and termination. It is rare when a court imposes liability on directors of a corporation for breach of the duty of care, and this Court is hesitant to second-guess the business judgment of a disinterested and independent board of directors. But the facts alleged in the new complaint do not implicate merely negligent or grossly negligent decision making by corporate directors. Quite the contrary; plaintiffs' new complaint suggests that the Disney directors failed to exercise *any* business judgment and failed to make *any* good faith attempt to fulfill their fiduciary duties to Disney and its stockholders. Allegations that Disney's directors abdicated all responsibility to consider appropriately an action of material importance to the corporation puts directly in question whether the board's decision-making processes were employed in a good faith effort to advance corporate interests. In short, the new complaint alleges facts implying that the Disney directors failed to "act in good faith and meet minimal proceduralist standards of attention."[3] Based on the facts asserted in the new complaint, therefore, I believe plaintiffs have stated cognizable claims for which demand is excused and on which a more complete factual record is necessary.

## I. PROCEDURAL AND FACTUAL BACKGROUND

As mentioned, this case involves an attack on decisions of the Walt Disney Com-

---

**1.** *In re The Walt Disney Co. Derivative Litig.,* Del.Ch., C.A. No. 15452–NC, Chandler, C., bench ruling (March 6, 2003).

**2.** The Disney Board of Directors changed from the time Ovitz was hired to the time of his non-fault termination. Therefore, the board at the time Ovitz was hired is referred to as the "Old Board," and the board at the time of the non-fault termination is the "New Board."

**3.** *Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1052 (Del.Ch.1996).

pany's board of directors, approving an executive compensation contract for Michael Ovitz, as well as impliedly approving a non-fault termination that resulted in an award to Ovitz (allegedly exceeding $140,000,000) after barely one year of employment. After the Supreme Court's remand regarding plaintiffs' first amended complaint,[4] plaintiffs used the "tools at hand," a request for books and records as authorized under 8 *Del. C.* § 220, to obtain information about the nature of the Disney Board's involvement in the decision to hire and, eventually, to terminate Ovitz. Using the information gained from that request, plaintiffs drafted and filed the new complaint, which is the subject of the pending motions. The facts, as alleged in the new complaint, portray a markedly different picture of the corporate processes that resulted in the Ovitz employment agreement than that portrayed in the first amended complaint.[5] For that reason, it is necessary to set forth the repleaded facts in some detail. The facts set forth hereafter are taken directly from the new complaint and, for purposes of the present motions, are accepted as true. Of course, I hold no opinion as to the actual truth of any of the allegations set forth in the new complaint; nor do I hold any view as to the likely ultimate outcome on the merits of claims based on these asserted facts. I determine here *only* that the facts, if true, arguably support all three of plaintiffs' claims for relief, as asserted in the new complaint, and are sufficient to excuse demand and to state claims that warrant development of a full record.

## A. The Decision to Hire Ovitz

Michael Eisner is the chief executive officer ("CEO") of the Walt Disney Company. In 1994, Eisner's second-in-command, Frank Wells, died in a helicopter crash. Two other key executives–Jeffrey Katzenberg and Richard Frank–left Disney shortly thereafter, allegedly because of Eisner's management style. Eisner began looking for a new president for Disney and chose Michael Ovitz. Ovitz was founder and head of CAA, a talent agency; he had never been an executive for a publicly owned entertainment company. He had, however, been Eisner's close friend for over twenty-five years.

Eisner decided unilaterally to hire Ovitz. On August 13, 1995, he informed three Old Board members–Stephen Bollenbach, Sanford Litvack, and Irwin Russell (Eisner's personal attorney)–of that fact. All three protested Eisner's decision to hire Ovitz. Nevertheless, Eisner persisted, sending Ovitz a letter on August 14, 1995, that set forth certain material terms of his prospective employment. Before this, neither the Old Board nor the compensation committee had ever discussed hiring Ovitz as president of Disney. No discussions or presentations were made to the compensation committee or to the Old Board regarding Ovitz's hiring as president of Walt Disney until September 26, 1995.

Before informing Bollenbach, Litvack, and Russell on August 13, 1995, Eisner collected information on his own, through his position as the Disney CEO, on the

4. *Brehm v. Eisner,* 746 A.2d 244, 249 (Del. 2000).

5. This case is yet another example where a books and records request in the first instance might have prevented expensive and time-consuming procedural machinations that too often occur in derivative litigation. The Supreme Court and this Court have repeatedly

urged derivative plaintiffs to seek books and records before filing a complaint. *See, e.g., Guttman v. Huang,* Del.Ch., C.A. No. 19571-NC, at 1–2, Strine, V.C., 823 A.2d 492, 493–94 (May 5, 2003). The amended pleading in this case is a perfect illustration of the benefit of such an approach.

potential hiring of Ovitz. In an internal document created around July 7, 1995, concerns were raised about the number of stock options to be granted to Ovitz. The document warned that the number was far beyond the normal standards of both Disney and corporate America and would receive significant public criticism. Additionally, Graef Crystal, an executive compensation expert, informed board member Russell, via a letter dated August 12, 1995, that, generally speaking, a large signing bonus is hazardous because the full cost is borne immediately and completely even if the executive fails to serve the full term of employment.[6] Neither of these documents, however, were submitted to either the compensation committee or the Old Board before hiring Ovitz. Disney prepared a draft employment agreement on September 23, 1995. A copy of the draft was sent to Ovitz's lawyers, but was not provided to members of the compensation committee.

The compensation committee, consisting of defendants Ignacio Lozano, Jr., Sidney Poitier, Russell, and Raymond Watson, met on September 26, 1995, for just under an hour. Three subjects were discussed at the meeting, one of which was Ovitz's employment. According to the minutes, the committee spent the least amount of time during the meeting discussing Ovitz's hiring. In fact, it appears that more time was spent on discussions of paying $250,000 to Russell for his role in securing Ovitz's employment than was actually spent on discussions of Ovitz's employment. The minutes show that several issues were raised and discussed by the committee members concerning Russell's fee. All that occurred during the meeting regarding Ovitz's employment was that

Russell reviewed the employment terms with the committee and answered a few questions. Immediately thereafter, the committee adopted a resolution of approval.

No copy of the September 23, 1995 draft employment agreement was actually given to the committee. Instead, the committee members received, at the meeting itself, a rough summary of the agreement. The summary, however, was incomplete. It stated that Ovitz was to receive options to purchase five million shares of stock, but did not state the exercise price. The committee also did not receive any of the materials already produced by Disney regarding Ovitz's possible employment. No spreadsheet or similar type of analytical document showing the potential payout to Ovitz throughout the contract, or the possible cost of his severance package upon a non-fault termination, was created or presented. Nor did the committee request or receive any information as to how the draft agreement compared with similar agreements throughout the entertainment industry, or information regarding other similarly situated executives in the same industry.

The committee also lacked the benefit of an expert to guide them through the process. Graef Crystal, an executive compensation expert, had been hired to provide advice to Disney on Eisner's new employment contract. Even though he had earlier told Russell that large signing bonuses, generally speaking, can be hazardous, neither he nor any other expert had been retained to assist Disney regarding Ovitz's hiring. Thus, no presentations, spreadsheets, written analyses, or opinions were given by any expert for the compensation committee to rely upon in reaching its

**6.** Graef Crystal had been retained to advise Disney on Eisner's employment contract. Although not absolutely clear in the new com-

plaint, it was apparently in this context that Crystal advised Russell of the dangers of a large signing bonus.

decision. Although Crystal was not retained as a compensation consultant on the Ovitz contract, he later lamented his failure to intervene and produce a spreadsheet showing the potential costs of the employment agreement.

The compensation committee was informed that further negotiations would occur and that the stock option grant would be delayed until the final contract was worked out. The committee approved the general terms and conditions of the employment agreement, but did not condition their approval on being able to review the final agreement. Instead, the committee granted Eisner the authority to approve the final terms and conditions of the contract as long as they were within the framework of the draft agreement.

Immediately after the compensation committee met on September 26, the Old Board met. Again, no expert was present to advise the board. Nor were any documents produced to the board for it to review before the meeting regarding the Ovitz contract. The board did not ask for additional information to be collected or presented regarding Ovitz's hiring. According to the minutes, the compensation committee did not make any recommendation or report to the board concerning its resolution to hire Ovitz. Nor did Russell, who allegedly secured Ovitz's employment, make a presentation to the board. The minutes of the meeting were fifteen pages long, but only a page and a half covered Ovitz's possible employment. A portion of that page and a half was spent discussing the $250,000 fee paid to Russell for obtaining Ovitz. According to the minutes, the Old Board did not ask any questions about the details of Ovitz's salary, stock options, or possible termination. The Old Board also did not consider the consequences of a termination, or the various payout scenarios that existed. Nevertheless, at that same meeting, the Old Board decided to appoint Ovitz president of Disney. Final negotiation of the employment agreement was left to Eisner, Ovitz's close friend for over twenty-five years.

## B. Negotiation of the Employment Agreement

Ovitz was officially hired on October 1, 1995, and began serving as Disney's president, although he did not yet have an executed employment agreement with Disney. On October 16, 1995, the compensation committee was informed, via a brief oral report, that negotiations were ongoing with Ovitz. The committee was not given a draft of the employment agreement either before or during the meeting. A summary similar to the one given on September 26, 1995, was presented. The committee did not seek any further information about the negotiations or about the terms and conditions of Ovitz's agreement, nor was any information proffered regarding the scope of the non-fault termination provision. And, as before, no expert was available to advise the committee as to the employment agreement.

Negotiations continued among Ovitz, Eisner, and their attorneys. The lawyers circulated drafts on October 3, October 10, October 16, October 20, October 23, and December 12, 1995. The employment agreement was physically executed between Michael Ovitz and the Walt Disney Company on December 12, 1995. The employment agreement, however, was backdated to October 1, 1995, the day Ovitz began working as Disney's president. Additionally, the stock option agreement associated with the employment agreement was executed by Eisner (for Disney) on April 2, 1996. Ovitz did not countersign the stock option agreement until November 15, 1996, when he was already discussing his plans to leave Disney's employ.

Neither the Old Board nor the compensation committee reviewed or approved the final employment agreement before it was executed and made binding upon Disney.

### C. The Final Version of Ovitz's Employment Agreement

The final version of Ovitz's employment agreement differed significantly from the drafts summarized to the compensation committee on September 26, 1995, and October 16, 1995. First, the final version caused Ovitz's stock options to be "in the money" when granted. The September 23rd draft agreement set the exercise price at the stock price on October 2, 1995, the day after Ovitz began as president. On October 16, 1995, the compensation committee agreed to change the exercise price to the price on that date (October 16, 1995), a price similar to that on October 2nd. The agreement was not signed until December 12, 1995, however, at which point the value of Disney stock had increased by eight percent–from $56.875 per share on October 16th to $61.50 per share on December 12th. The overall stock market, according to the Dow Jones Industrial Average, had also increased by about eight percent at the same time. By waiting to sign the agreement until December, but not changing the date of the exercise price, Ovitz had stock options that instantly were "in the money."[7] This allowed Ovitz to play a "win-win" game at Disney's expense–if the market price of Disney stock had fallen between October 16 and December 12, Ovitz could have demanded a downward adjustment to the option exercise price; if the price had risen (as in fact it had) Ovitz would receive "in the money" options.

Another difference in the final version of Ovitz's employment agreement concerned the circumstances surrounding a non-fault termination. The September 23rd draft agreement stated that non-fault termination benefits would only be provided if Disney wrongfully terminated Ovitz, or Ovitz died or became disabled. The October 16th draft contained a very similar definition. These were the only two drafts of which the compensation committee was made aware. The final version of the agreement, however, offered Ovitz a non-fault termination as long as Ovitz did not act with gross negligence or malfeasance. Therefore, instead of protecting Ovitz from a wrongful termination by Disney, Ovitz was able to receive the full benefits of a non-fault termination, even if he acted negligently or was unable to perform his duties, as long as his behavior did not reach the level of gross negligence or malfeasance. Additionally, a non-compete clause was not included within the agreement should Ovitz leave Disney's employ.

The employment agreement had a term of five years. Ovitz was to receive a salary of $1 million per year, a potential bonus each year from $0 to $10 million, and a series of stock options (the "A" options) that enabled Ovitz to purchase three million shares of Disney stock at the October 16, 1995 exercise price. The options were to vest at one million per year for three years beginning September 30, 1998. At the end of the contract term, if Disney entered into a new contract with Ovitz, he was entitled to the "B" options, an additional two million shares. There was no requirement, however, that Disney enter into a new contract with Ovitz.

Should a non-fault termination occur, however, the terms of the final version of

---

7. The options were apparently granted to Ovitz when the employment agreement was signed on December 12, 1995. Ovitz did not countersign the accompanying stock option agreement until November 15, 1996.

the employment agreement appeared to be even more generous. Under a non-fault termination, Ovitz was to receive his salary for the remainder of the contract, discounted at a risk-free rate keyed to Disney's borrowing costs. He was also to receive a $7.5 million bonus for each year remaining on his contract, discounted at the same risk-free rate, even though no set bonus amount was guaranteed in the contract. Additionally, all of his "A" stock options were to vest immediately, instead of waiting for the final three years of his contract for them to vest. The final benefit of the non-fault termination was a lump sum "termination payment" of $10 million. The termination payment was equal to the payment Ovitz would receive should he complete his full five-year term with Disney, but not receive an offer for a new contract. Graef Crystal opined in the January 13, 1997, edition of *California Law Business* that "the contract was most valuable to Ovitz the sooner he left Disney."

### D. Ovitz's Performance as Disney's President

Ovitz began serving as president of Disney on October 1, 1995, and became a Disney director in January 1996. Ovitz's tenure as Disney's president proved unsuccessful. Ovitz was not a good second-in-command, and he and Eisner were both aware of that fact. Eisner told defendant Watson, via memorandum, that he (Eisner) "had made an error in judgment in who I brought into the company."[8] Other company executives were reported in the December 14, 1996 edition of the New York Times as saying that Ovitz had an excessively lavish office, an imperious management style, and had started a feud with NBC during his tenure. Even Ovitz admitted, during a September 30, 1996 interview on "Larry King Live," that he knew "about 1% of what I need to know."[9]

Even though admitting that he did not know his job, Ovitz studiously avoided attempts to be educated. Eisner instructed Ovitz to meet weekly with Disney's chief financial officer, defendant Bollenbach. The meetings were scheduled to occur each Monday at 2 p.m., but every week Ovitz cancelled at the last minute. Bollenbach was quoted in a December 1996 issue of Vanity Fair as saying that Ovitz failed to meet with him at all, "didn't understand the duties of an executive at a public company[,] and he didn't want to learn."[10]

Instead of working to learn his duties as Disney's president, Ovitz began seeking alternative employment. He consulted Eisner to ensure that no action would be taken against him by Disney if he sought employment elsewhere. Eisner agreed that the best thing for Disney, Eisner, and Ovitz was for Ovitz to gain employment elsewhere. Eisner wrote to the chairman of Sony Japan that Ovitz could negotiate with Sony without any repercussions from Disney. Ovitz and Sony began negotiations for Ovitz to become head of Sony's entertainment business, but the negotiations ultimately failed. With the possibility of having another company absorb the cost of Ovitz's departure now gone, Eisner and Ovitz began in earnest to discuss a non-fault termination.

### E. The Non–Fault Termination

Ovitz wanted to leave Disney, but could only terminate his employment if one of three events occurred: (1) he was not elected or retained as president and a director of Disney; (2) he was assigned duties materially inconsistent with his role

---

**8.** Pls.' Second Am. Compl. ¶ 70.

**9.** Pls.' Second Am. Compl. ¶ 74.

**10.** Pls.' Second Am. Compl. ¶ 73.

as president; or (3) Disney reduced his annual salary or failed to grant his stock options, pay him discretionary bonuses, or make any required compensation payment. None of these three events occurred. If Ovitz resigned outright, he might have been liable to Disney for damages and would not have received the benefits of the non-fault termination. He also desired to protect his reputation when exiting from his position with Disney. Eisner agreed to help Ovitz depart Disney without sacrificing any of his benefits. Eisner and Ovitz worked together as close personal friends to have Ovitz receive a non-fault termination. Eisner stated in a letter to Ovitz that: "I agree with you that we must work together to assure a smooth transition and deal with the public relations brilliantly. I am committed to make this a win-win situation, to keep our friendship intact, to be positive, to say and write only glowing things.... Nobody ever needs to know anything other than positive things from either of us. This can all work out!" [11]

Eisner, Litvack, and Ovitz met at Eisner's apartment on December 11, 1996, to finalize Ovitz's non-fault termination. The new complaint alleges that the New Board was aware that Eisner was negotiating with Ovitz the terms of his separation. Litvack sent a letter to Ovitz on December 12, 1996, stating that, by "mutual agreement," (1) Ovitz's term of employment would end on January 31, 1997; and (2) "this letter will for all purposes of the Employment Agreement be given the same effect as though there had been a 'Non–Fault Termination,' and the Company will pay you, on or before February 5, 1997, all amounts due you under the Employment Agreement, including those under Section 11(c) thereof. In addition, the stock options granted pursuant to Option A, will vest as of January 31, 1997 and will expire in accordance with their terms on September 30, 2002." [12] On December 12, 1996, Ovitz's departure from Disney became public. Neither the New Board of Directors nor the compensation committee had been consulted or given their approval for a non-fault termination. In addition, no record exists of any action by the New Board once the non-fault termination became public on December 12, 1996.

On December 27, 1996, Litvack sent Ovitz a new letter superseding the December 12th letter. The December 27th letter stated that Ovitz's termination would "be treated as a 'Non–Fault Termination.'" [13] This differed from the December 12th letter, which treated Ovitz's termination "as though there had been a 'Non–Fault Termination.'" [14] It also made the termination of Ovitz's employment and his resignation as a Disney director effective as of the close of business on December 27th, instead of on January 31, 1997, as in the December 12th letter. Additionally, it listed the amount payable to Ovitz as $38,888,230.77, and stated that the "A" options to purchase three million shares of Disney vested on December 27th, instead of January 31, 1997, as in the December 12th letter. Both Eisner and Litvack signed the letter. Again, however, neither the New Board nor the compensation committee reviewed or approved the December 27th letter. No record exists of any New Board action after the December 27th letter became public, nor had any board member raised any questions or concerns since the original December 12th letter became public.

---

11. Pls.' Second Am. Compl. ¶ 80.

12. Pls.' Second Am. Compl. ¶ 85.

13. Pls.' Second Am. Compl. ¶ 87.

14. Pls.' Second Am. Compl. ¶ 85.

According to the new complaint, Disney's bylaws required board approval for Ovitz's non-fault termination. Eisner and Litvack allegedly did not have the authority to provide for a non-fault termination without board consent. No documents or board minutes currently exist showing an affirmative decision by the New Board or any of its committees to grant Ovitz a non-fault termination. The New Board was already aware that Eisner was granting the non-fault termination as of December 12, 1996, the day it became public. No record of any action by the New Board affirming or questioning that decision by Eisner either before or after that date has been produced. There are also no records showing that alternatives to a non-fault termination were ever evaluated by the New Board or by any of its committees.

## II. STANDARD OF REVIEW

### A. Rule 23.1 Motion to Dismiss

 When the plaintiff alleges a derivative claim, demand must be made on the board or excused based upon futility.[15] To determine whether demand would be futile, the Court must determine whether the particular facts, as alleged, create a reason to doubt that: "(1) the directors are disinterested and independent" or "(2) the challenged transaction was otherwise the product of a valid exercise of business judgment." [16]

 The complaint must plead with sufficient particularity the facts to support demand futility.[17] This is more than the notice pleading requirement under Court of Chancery Rule 8(a), but is not to the level of evidence.[18] The complaint must set forth "particularized factual statements that are essential to the claim." [19] Mere speculation or opinion is not enough.[20]

### B. Rule 12(b)(6) Motion to Dismiss

 The standard governing a motion to dismiss is well established. A party is entitled to dismissal of the complaint only where it is clear from its allegations that the plaintiff would not be entitled to relief under any set of facts that could be proven to support the claim.[21] Moreover, the Court is required to accept all of plaintiff's well-pleaded factual allegations as true and give plaintiff the benefit of all inferences that may be drawn from the facts.[22] Conclusory statements, without specific allegations of facts to support them, will not suffice.[23] Since the standard under Rule 12(b)(6) is less stringent than the standard under Rule 23.1, a complaint that survives a Rule 23.1 motion to dismiss generally will also survive a Rule 12(b)(6) motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim.[24]

## III. ANALYSIS

 The primary issue before the Court is whether plaintiffs' new complaint

---

15. *See* Court of Chancery Rule 23.1.

16. *Aronson v. Lewis,* 473 A.2d 805, 814 (Del. 1984).

17. *Brehm,* 746 A.2d at 245.

18. *Id.*

19. *Id.*

20. *Id.*

21. *Rabkin v. Philip A. Hunt Chemical Corp.,* 498 A.2d 1099, 1104 (Del.1985).

22. *Grobow v. Perot,* 539 A.2d 180, 187 (Del. 1988).

23. *In re Tri–Star Pictures, Inc.,* 634 A.2d 319, 326 (Del.1993).

24. *See Solomon v. Pathe Communications Corp.,* 672 A.2d 35, 39 (Del.1996).

survives the Rule 23.1 motion to dismiss under the second prong of *Aronson v. Lewis*.[25] In order for demand to be excused under the second prong of *Aronson*, plaintiffs must allege particularized facts that raise doubt about whether the challenged transaction is entitled to the protection of the business judgment rule.[26] Plaintiffs may rebut the presumption that the board's decision is entitled to deference by raising a reason to doubt whether the board's action was taken on an informed basis or whether the directors honestly and in good faith believed that the action was in the best interests of the corporation.[27] Thus, plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision.

Defendants contend that the new complaint cannot be read reasonably to allege any fiduciary duty violation other than, at most, a breach of the directors' duty of due care. They further assert that even if the complaint states a breach of the directors' duty of care, Disney's charter provision, based on 8 *Del. C.* § 102(b)(7), would apply and the individual directors would be protected from personal damages liability for any breach of their duty of care. A § 102(b)(7) provision in a corporation's charter does not "eliminate or limit the liability of a director: (i)[f]or any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit."[28] A fair reading of the new complaint, in my opinion, gives rise to a reason to doubt whether the board's actions were taken honestly and in good faith, as required under the second prong of *Aronson*. Since acts or omissions not undertaken honestly and in good faith, or which involve intentional misconduct, do not fall within the protective ambit of § 102(b)(7), I cannot dismiss the complaint based on the exculpatory Disney charter provision.[29]

Defendants also argue that Ovitz's employment agreement was a reasonable exercise of business judgment. They argue that Ovitz's previous position as head of CAA required a large compensation package to entice him to become Disney's president. As to the non-fault termination, defendants contend that that decision was reasonable in that the board wished to avoid protracted litigation with Ovitz. The Court is appropriately hesitant to second-

---

**25.** 473 A.2d at 814. The Supreme Court affirmed the dismissal of plaintiffs' previous complaint under the first prong of *Aronson* and prohibited that issue from being relitigated. *Brehm*, 746 A.2d at 258 & n. 42. As discussed earlier, the new complaint must survive a Rule 23.1 motion to dismiss because it is a derivative action. The facts alleged here are the same for both the 23.1 motions and the 12(b)(6) motions. Thus, since the standard for a Rule 23.1 dismissal is more stringent than that under Rule 12(b)(6), should the new complaint survive under the second prong of *Aronson*, it will survive under Rule 12(b)(6) if *its facts otherwise state a* cognizable claim.

**26.** *Aronson*, 473 A.2d at 814–15.

**27.** *Id.* at 812.

**28.** 8 *Del. C.* § 102(b)(7). As to (iii), § 174 deals with a director's liability for unlawful payment of dividends or unlawful stock purchase or redemption.

**29.** *See Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del.2001) (holding that, as a matter of law, § 102(b)(7) bars a claim only if there is an unambiguous, residual due care claim and nothing else).

guess the business judgment of a disinterested and independent board of directors. As alleged in the new complaint, however, the facts belie any assertion that the New or Old Boards exercised *any* business judgment or made *any* good faith attempt to fulfill the fiduciary duties they owed to Disney and its shareholders.

### A. The Old and New Boards

■ According to the new complaint, Eisner unilaterally made the decision to hire Ovitz, even in the face of internal documents warning of potential adverse publicity and with three members of the board of directors initially objecting to the hiring when Eisner first broached the idea in August 1995. No draft employment agreements were presented to the compensation committee or to the Disney board for review before the September 26, 1995 meetings. The compensation committee met for less than an hour on September 26, 1995, and spent most of its time on two other topics, including the compensation of director Russell for helping secure Ovitz's employment. With respect to the employment agreement itself, the committee received only a summary of its terms and conditions. No questions were asked about the employment agreement. No time was taken to review the documents for approval. Instead, the committee approved the hiring of Ovitz and directed Eisner, Ovitz's close friend, to carry out the negotiations with regard to certain still unresolved and significant details.[30]

The Old Board met immediately after the committee did. Less than one and one-half pages of the fifteen pages of Old Board minutes were devoted to discus-

sions of Ovitz's hiring as Disney's new president. Actually, most of that time appears to have been spent discussing compensation for director Russell. No presentations were made to the Old Board regarding the terms of the draft agreement. No questions were raised, at least so far as the minutes reflect. At the end of the meeting, the Old Board authorized Ovitz's hiring as Disney's president. No further review or approval of the employment agreement occurred. Throughout both meetings, no expert consultant was present to advise the compensation committee or the Old Board. Notably, the Old Board approved Ovitz's hiring even though the employment agreement was still a "work in progress." The Old Board simply passed off the details to Ovitz and his good friend, Eisner.

Negotiation over the remaining terms took place solely between Eisner, Ovitz, and attorneys representing Disney and Ovitz. The compensation committee met briefly in October to review the negotiations, but failed again to actually consider a draft of the agreement or to establish any guidelines to be used in the negotiations. The committee was apparently not otherwise involved in the negotiations. Negotiations with Eisner continued until mid-December, but Ovitz had already started serving as Disney's president as of October 1, 1995.

Eisner and Ovitz reached a final agreement on December 12, 1995. They agreed to backdate the agreement, however, to October 1, 1995. The final employment agreement also differed substantially from the original draft, but evidently no further committee or board review of it ever oc-

---

30. The allegation that Eisner and Ovitz had been close friends for over twenty-five years is not mentioned to show self-interest or domination. Instead, the allegation is mentioned because it casts doubt on the good faith and judgment behind the Old and New Boards' decisions to allow two close personal friends to control the payment of shareholders' money to Ovitz.

curred. The final version of Ovitz's employment agreement was signed (according to the new complaint) without *any* board input beyond the limited discussion on September 26, 1995.

From the outset, Ovitz performed poorly as Disney's president. In short order, Ovitz wanted out, and, once again, his good friend Eisner came to the rescue, agreeing to Ovitz's request for a non-fault termination. Disney's board, however, was allegedly never consulted in this process. No board committee was ever consulted, nor were any experts consulted. Eisner and Litvack alone granted Ovitz's non-fault termination, which became public on December 12, 1996. Again, Disney's board did not appear to question this action, although affirmative board action seemed to be required. On December 27, 1996, Eisner and Litvack, without explanation, accelerated the effective date of the non-fault termination, from January 31, 1997, to December 27, 1996. Again, the board apparently took no action; no questions were asked as to why this was done.

Disney had lost several key executives in the months before Ovitz was hired. Moreover, the position of president is obviously important in a publicly owned corporation. But the Old Board and the compensation committee (it is alleged) each spent less than an hour reviewing Ovitz's possible hiring. According to the new complaint, neither the Old Board nor the compensation committee reviewed the actual draft employment agreement. Nor did they evaluate the details of Ovitz's salary or his severance provisions. No expert presented the board with details of

the agreement, outlined the pros and cons of either the salary or non-fault termination provisions, or analyzed comparable industry standards for such agreements.[31] Notwithstanding this alleged information vacuum, the Old Board and the compensation committee approved Ovitz's hiring, appointed Eisner to negotiate with Ovitz directly in drafting the unresolved terms of his employment, never asked to review the final terms, and were never voluntarily provided those terms.

During the negotiation over the unresolved terms, the compensation committee was involved only once, at the very early stages in October 1995. The final agreement varied significantly from the draft agreement in the areas of both stock options and the terms of the non-fault termination. Neither the compensation committee nor the Old Board sought to review, nor did they review, the final agreement. In addition, both the Old Board and the committee failed to meet in order to evaluate the final agreement before it became binding on Disney. To repeat, no expert was retained to advise the Old Board, the committee, or Eisner during the negotiation process.

■ The new complaint, fairly read, also charges the New Board with a similar ostrich-like approach regarding Ovitz's non-fault termination. Eisner and Litvack granted Ovitz a non-fault termination on December 12, 1996, and the news became public that day. Although formal board approval appeared necessary for a non-fault termination, the new complaint alleges that no New Board member even asked

---

**31.** In the earlier proceedings in this case, defendants represented that Graef Crystal served as the expert with regard to Ovitz's employment, arguably providing the board with the statutory safe harbor under 8 *Del. C.* § 141(e). The new complaint, however, alleges that Graef Crystal was hired as the expert with regard to *Eisner's* new employment agreement, *not* Ovitz's agreement. Accepting this change in facts as true for purposes of this motion, Disney's board is not entitled to invoke § 141(e)'s protection based on a board's reliance upon a qualified expert selected with reasonable care.

for a meeting to discuss Eisner's and Litvack's decision. On December 27, 1996, when Eisner and Litvack accelerated Ovitz's non-fault termination by over a month, with a payout of more than $38 million in cash, together with the three million "A" stock options, the board again failed to do anything. Instead, it appears from the new complaint that the New Board played no role in Eisner's agreement to award Ovitz more than $38 million in cash and the three million "A" stock options, all for leaving a job that Ovitz had allegedly proven incapable of performing.

The New Board apparently never sought to negotiate with Ovitz regarding his departure. Nor, apparently, did it consider whether to seek a termination based on fault. During the fifteen-day period between announcement of Ovitz's termination and its effective date, the New Board allegedly chose to remain invisible in the process. The new complaint alleges that the New Board: (1) failed to ask why it had not been informed; (2) failed to inquire about the conditions and terms of the agreement; and (3) failed even to attempt to stop or delay the termination until more information could be collected. If the board had taken the time or effort to review these or other options, perhaps with the assistance of expert legal advisors, the business judgment rule might well protect its decision. In this case, however, the new complaint asserts that the New Board directors refused to explore any alternatives, and refused to even attempt to evaluate the implications of the non-fault termination–blindly allowing Eisner to hand over to his personal friend, Ovitz,

more than $38 million in cash and the three million "A" stock options.[32]

These facts, if true, do more than portray directors who, in a negligent or grossly negligent manner, merely failed to inform themselves or to deliberate adequately about an issue of material importance to their corporation. Instead, the facts alleged in the new complaint suggest that the defendant directors *consciously and intentionally disregarded their responsibilities,* adopting a "we don't care about the risks" attitude concerning a material corporate decision. Knowing or deliberate indifference by a director to his or her duty to act faithfully and with appropriate care is conduct, in my opinion, that may not have been taken honestly and in good faith to advance the best interests of the company. Put differently, all of the alleged facts, if true, imply that the defendant directors *knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss. Viewed in this light, plaintiffs' new complaint sufficiently alleges a breach of the directors' obligation to act honestly and in good faith in the corporation's best interests for a Court to conclude, if the facts are true, that the defendant directors' conduct fell outside the protection of the business judgment rule.[33]

Of course, the alleged facts need only give rise to a reason to doubt business judgment protection, not "a judicial finding that the directors' actions are not protected by the business judgment rule." [34] For this reason, I conclude that plaintiffs have

---

**32.** Plaintiffs allege that the present value of the cash and the value of the stock options totaled over $140 million to Ovitz as severance. At this time I need not determine whether plaintiffs' allegations as to the value of the payout are correct or incorrect.

**33.** *Aronson,* 473 A.2d at 812.

**34.** *Grobow,* 539 A.2d at 186.

satisfied the second prong of *Aronson,* and that demand is excused.

I also conclude that plaintiffs' pleading is sufficient to withstand a motion to dismiss under Rule 12(b)(6). Specifically, plaintiffs' claims are based on an alleged knowing and deliberate indifference to a potential risk of harm to the corporation. Where a director consciously ignores his or her duties to the corporation, thereby causing economic injury to its stockholders, the director's actions are either "not in good faith" or "involve intentional misconduct." [35] Thus, plaintiffs' allegations support claims that fall *outside* the liability waiver provided under Disney's certificate of incorporation.

### B. Ovitz

■ Defendant Ovitz contends that the action against him should be dismissed because he owed no fiduciary duty not to seek the best possible employment agreement for himself. Ovitz did have the right to seek the best employment agreement possible for himself. Nevertheless, once Ovitz became a fiduciary of Disney on October 1, 1995, according to the new complaint, he also had a duty to negotiate honestly and in good faith so as not to advantage himself at the expense of the Disney shareholders. He arguably failed to fulfill that duty, according to the facts alleged in the new complaint.

Ovitz and Eisner had been close friends for over twenty-five years. Ovitz knew when he became president of Disney on October 1, 1995, that his unexecuted contract was still under negotiation. Instead of negotiating with an impartial entity, such as the compensation committee, Ovitz and his attorneys negotiated directly with

Eisner, his close personal friend. Perhaps not surprisingly, the final version of the employment agreement differed significantly from the draft version summarized to the board and to the compensation committee on September 26, 1995. Had those changes been the result of arms-length bargaining, Ovitz's motion to dismiss might have merit. At this stage, however, the alleged facts (which I must accept as true) suggest that Ovitz and Eisner had almost absolute control over the terms of Ovitz's contract.

The new complaint arguably charges that Ovitz engaged in a carefully orchestrated, self-serving process controlled directly by his close friend Eisner, all designed to provide Ovitz with enormous financial benefits. The case law cited by Ovitz in support of his position suggests that an officer may negotiate his or her own employment agreement *as long as the process involves negotiations performed in an adversarial and arms-length manner.* [36] The facts, as alleged in the new complaint, belie an adversarial, arms-length negotiation process between Ovitz and the Walt Disney Company. Instead, the alleged facts, if true, would support an inference that Ovitz may have breached his fiduciary duties by engaging in a self-interested transaction in negotiating his employment agreement directly with his personal friend Eisner.

The same is true regarding the non-fault termination. In that instance, Ovitz was also serving as a member of the Disney board of directors. The Supreme Court recently held in *Telxon Corp. v. Meyerson* that "directoral self-compensation deci-

---

**35.** 8 *Del. C.* § 102(b)(7)(ii).

**36.** Ovitz cites *Stifel Fin. Corp. v. Cochran,* 809 A.2d 555 (Del.Supr.2002), as well as certain other non-precedential cases, to support his

position. All cases, as pointed out directly by Ovitz in his reply brief, base the holding upon an adversarial, arms-length transaction.

sions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation." [37] According to the facts alleged in the new complaint, Ovitz did not advise the Disney board of his decision to seek a departure that would be fair and equitable to all parties. Instead, he went to his close friend, Eisner, and, working together, they developed a secret strategy that would enable Ovitz to extract the maximum benefit from his contract, all without board approval.

Although the strategy was economically injurious and a public relations disaster for Disney, the Ovitz/Eisner exit strategy allegedly was designed principally to protect their personal reputations, while assuring Ovitz a huge personal payoff after barely a year of mediocre to poor job performance. These allegations, if ultimately found to be true, would suggest a faithless fiduciary who obtained extraordinary personal financial benefits at the expense of the constituency for whom he was obliged to act honestly and in good faith. Because Ovitz was a fiduciary during both the negotiation of his employment agreement and the non-fault termination, he had an obligation to ensure the process of his contract negotiation and termination was both impartial and fair. The facts, as plead, give rise to a reasonable inference that, assisted by Eisner, he ignored that obligation.

37. 802 A.2d 257, 265 (Del.2002).

## IV. CONCLUSION

It is of course true that after-the-fact litigation is a most imperfect device to evaluate corporate business decisions, as the limits of human competence necessarily impede judicial review. But our corporation law's theoretical justification for disregarding honest errors simply does not apply to intentional misconduct or to egregious process failures that implicate the foundational directoral obligation to act honestly and in good faith to advance corporate interests. Because the facts alleged here, if true, portray directors consciously indifferent to a material issue facing the corporation, the law must be strong enough to intervene against abuse of trust. Accordingly, all three of plaintiffs' claims for relief concerning fiduciary duty breaches and waste survive defendants' motions to dismiss.

The practical effect of this ruling is that defendants must answer the new complaint and plaintiffs may proceed to take appropriate discovery on the merits of their claims. To that end, a case scheduling order has been entered that will promptly bring this matter before the Court on a fully developed factual record.

IT IS SO ORDERED.