In re Quintiles Transnational Corp. S'holders Litig., 2003 NCBC 11

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

IN THE GENERAL COURT OF
JUSTICE
SUPERIOR COURT DIVISION

Consolidated Civil Action
No. 02 CVS 5348

IN RE QUINTILES TRANSNATIONAL )
CORP. SHAREHOLDERS )
LITIGATION )

## ORDER AND OPINION

{1}      This matter comes before the Court on the fee application of plaintiffs' counsel in this matter. The Court has previously authorized payment of the funds. This opinion contains the reasoning behind the Court's approval of the attorney fees in this case. Together with the Court's opinion in *In Re Wachovia Shareholders Litigation,* 2003 NCBC 10 entered today, it sets a framework for the approval of fee applications in shareholder litigation in North Carolina. This opinion should be read in conjunction with the *Wachovia* fee opinion. The Court concluded in that case, and holds here, that fee awards may be made in class action shareholder litigation even though no specific or ascertainable fund is created for the benefit of shareholders out of which the attorney fees are paid.

*Donaldson & Black, P.A.  by Arthur J. Donaldson and John T. O'Neal  for Plaintiff Breakwater Partners, L.P.*

*Abrams & Abrams, P.A. by  Douglas B. Abrams and Margaret S. Abrams for Plaintiffs Joseph Swetye, Lois Anderson, Gamillel Shab, and William Steiner.*

*Maxwell, Freeman & Bowman, P.A. by James B. Maxwell  for Plaintiffs Mary Lewis and Gregory Tatoian.*

*James, McElroy & Diehl, P.A  by Bruce M. Simpson for Plaintiff Charles Miller.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, PLLC, by Jim W. Phillips, Jr. and Jennifer K. Van Zant for Defendant Dennis B. Gillings and Pharma Services.*

*Kilpatrick Stockton LLP by Hayden J. Silver, III for Defendant Dennis B. Gillings.*

*Smith Moore, LLP, by Donald Cowan, Jr., Lisa Kaminski Shortt, and Dixie T. Wells, fo Defendants Robert C. Bishop, Vaughn D. Bryson and Virginia V. Weldon.*

*Smith, Anderson, Blount, Dorsett Mitchell & Jernigan, LLP, by Carl N. Patterson, Jr., Donald H. Tucker, Jr., and Gerald F. Roach, for Defendants Arthur M. Pappas and Quintiles Transnational Corporation.*

*Hunton & Williams by L. Neal Ellis, Jr. for Defendants Eric J. Topol, Jim D. Kever, Chester W. Douglass, Pamela J. Kirby, E.G.F. Brown, and William L. Roper.*

{2}     On October 13, 2002, an investor group led by Dennis Gillings made a preliminary tender offer to the Board of Directors of Quintiles Transnational Corporation ("Quintiles") to acquire all of the outstanding shares of the common stock of Quintiles in a cash tender offer of $11.25 per share. Within two days and prior to any Board response, shareholder lawsuits were begun. From the time stamps on the complaints it appears that counsel were lined up at the office of the Clerk of Court of Durham County in a race to the courthouse to see who could file first. The race was won by the Brualdi law firm, which also succeeded in getting a temporary restraining order issued even though the Board of Quintiles had not had the opportunity to act on the proposal. The restraining order subsequently was withdrawn, as it should have been. The motion generating it was meritless. Subsequently, seven lawsuits were filed in Durham County. They were assigned to the Business Court and consolidated by court order.

{3}     Less than a month later, the Quintiles Board rejected the offer and hired Morgan Stanley to evaluate alternatives to a sale of the company. The Board ultimately decided to pursue a sale and undertook steps to commence a broad based auction process. The auction process was clearly in the best interest of the shareholders as the business of Quintiles was particularly difficult to value. Between December 2002 and April 2003, six different bidders participated in the auction process and conducted extensive due diligence and negotiations in two rounds of bidding. On April 10, 2003 Quintiles announced that it had signed a merger agreement with an investor group led by Gillings. The merger agreement provided for the purchase of outstanding shares of Quintiles common stock and options at $14.50 per share in cash, a 28% premium over Gillings initial offer and a 75% increase over the trading price on October 13, 2002. Plaintiffs do not contend that this lawsuit was the sole or even the principal factor that led to the increased offer. The Court has reviewed the actions of the Board and found that the directors fulfilled their fiduciary duty to the shareholders in the manner in which the auction was conducted. It appears to the Court that the auction process resulted in the shareholders receiving the highest price available on the market.

{4}     The fight for lead counsel during the course of the litigation was hotly contested. The Court appointed Beatie and Osborn LLP and Maxwell, Freeman & Brown P.A. lead counsel on February 13, 2003. Those firms negotiated the settlement approved by the Court.

## I.

{5}     When the Court is asked to approve a fee to be paid by the surviving company with no cost to the shareholders it is essentially being asked to insure that the settlement is not collusive between the company and class counsel and that the fee awarded is fair in light of the benefit provided by class counsel. The court must exercise its discretion to see that there are proper incentives for class counsel to bring shareholder lawsuits and insure that the litigation agency costs of such litigation do not outweigh the reduction in management costs attributable to the threat of litigation.

{6}     The Court is fully aware of the pressures on both the company and class counsel to resolve disputes in merger and acquisition cases. Procedures for reviewing those settlements and fee applications

should not make settlement impossible or more difficult. The company and class counsel have four options in resolving their disagreement over fees to be awarded in connection with the settlement of shareholder litigation. They may agree to let the court set the fee with input from both sides. They may agree on a set fee which both support. They may agree that the court can set the fee with a cap or maximum (or within a range), and the company agrees not to object to the fee request. They may agree that the court can set the fee with a cap or maximum (or within a range), and the company retains freedom to assert its position with respect to the fee award and the amount. In this instance, the parties chose the third option. The company agreed to a maximum fee of $450,000 and agreed not to object to the fee request. By contrast, the *Wachovia* case, which did not involve a settlement, required the Court to set the fee in a hotly contested debate. There, unlike this case, defendants argued the issues of causation and value as well as the standard to be applied by the court.

{7}    As a general rule, the trial court should determine three things before deciding the amount of the fee. Where no agreement has been reached, the company is free to contest all three. First, the court looks to see if the action was meritorious at the time it was filed. That issue will be addressed below. Second, it must determine that there was an ascertainable benefit received by the class. Third, it must determine if there existed a causal connection between the action and the benefit. *See In re Dunkin Donuts S'holder Litig.,* C.A. Nos. 10825, 10907, 1990 Del. Ch. LEXIS 197 (Del. Ch. Nov. 27, 1990); *In re MacMillan, Inc. S'holder Litig.,* C.A. Nos. 9909, 9953, 1989 Del. Ch. LEXIS 154 (Del. Ch. Nov. 16, 1989); *Chrysler Corp .v. Dann*, 223 A.2d 384, 386-87 (Del. Ch. 1965).

{8}    Once there is a showing of a meritorious claim, chronologically followed by the benefit sought, the burden shifts to the company to show that the lawsuit did not "in any way cause their action." The company can show that that the benefit was attributable to other causes. *Tandyscraft, Inc. v. Initio Partners*, 562 A.2d 1162, 1165 (Del. 1989); *Allied Artist Pictures Corp. v. Baron*, 413 A.2d 876, 880 (Del. 1980); *Louisiana State Employee's Retirement System v. Citrix Systems, Inc*, C.A. 18298, 2001 Del Ch. LEXIS 115, (Del. Ch. Sept. 17, 2001); *Grimes v. Donald*, 791 A.2d 818, 823-25 (Del. Ch. 2000).

{9}    In cases where the action was taken without court order, the court may still find a causal connection. It is not necessary that substantive relief be obtained in the lawsuit. Boards often proceed on their own to take actions independent of the litigation process. *See Tandyscraft*, 562 A.2d. at 1164 ; *Citrix*, 2001 LEXIS at *17.  This is just such a case. The Special Committee acted independently to fulfill its fiduciary duties, and class counsel candidly admit that they performed more of a monitoring role than any other function. In this matter, there is no clear monetary benefit created by the actions of class counsel, although they argue that the litigation resulted in part in a $380 million dollar increase in the offering price. The increase in the offering price resulted for the most part from the auction process.

{10}    Where, as in the instant case, the company chooses to agree to a fee to be set by the court with a cap and agrees not to object to a fee request in that amount, the company has created a prima facie case that the complaint was meritorious when filed and that there was an ascertainable benefit received by the

shareholders and some causal connection between the action and the benefit was present. In this instance, the company has acknowledged that the litigation was a factor in its deliberative process. *See* Affidavit of Daniel A, Osborn, Ex. C at Recital I and Ex F. Given the prima facie case and the additional acknowledgement, there is no basis on this record for the Court to find differently.  Had the Board believed that a lower fee was justified, it should have put itself in a position to present that information to the Court.

{11}     Nor has Quintiles provided the Court with any assistance with respect to the amount of the fee. The Board is in the best position to provide information to the Court concerning the contribution or causal connection between the litigation and its actions. Where it chooses not to provide that information, the Court will not engage in independent discovery, but will assume that the Board considered the amount it agreed to pay to be reasonable.[i] Generally no other party has a vested interest in the fee request, as it is not coming out of the pockets of shareholders.

{12}     However, the Court must make an independent determination of the fairness of the fee. It is free to decide that the fee agreed upon is unreasonable, unnecessary, or inflated. It must maintain public confidence in the litigation process. *See Citrix*, 2001 LEXIS at *11.

{13}     In the case before the Court, the fee requested falls at the outer edge of, but not beyond, the realm of reasonableness. For that reason and because it was unopposed, the Court elected not to reduce it. The fee request was certainly a small percentage (one- twelfth of one percent) of the total increase in the share price. Class counsel directed the court to several Delaware cases in which much higher fees were approved and where Special Committees had acted on their own.  *See In re Telerate, Inc. S'holders Litig.,* 1992 WL 44907 (Del. Ch. Apr. 26, 1991)*; Steiner v. Sithe-Energies, L.P.,* 1989 WL 50290 (Del. Ch. May 10, 1989); *Robert M. Bass Group v. Evans*, 1989 WL 137936 (Del. Ch. Nov. 16, 1989); *North Am. Phillips Stockholder Litig.*, 1987 WL 28434 (Del. Ch. Dec. 16, 1987).  The fee certainly was not in the range of the fees set aside by Chancellor Chandler. *See Citrix*, 2001 LEXIS at *37 (reducing fee award to $140,000 from $2,000,000); *In re Dunkin Donuts*, 1990 Del. Ch. LEXIS at *31 (reducing fee from $2.5 million to $922,000).  Had it been contested and some record created that addressed the value of the benefit, reduced the contribution or eliminated causation, the Court might have reached a different result. *See In Re Wachovia Shareholders Litigation,* 2003 NCBC 10 (No. 01 CVS 4486, Mecklenburg County Super. Ct)(Tennille, J.). Certainly, the fee was higher than the average fee in cases where the Delaware courts have applied their quantum meruit analysis in setting fees. *See Citrix*, 2001 LEXIS at *35 (stating Chancellor Chandler's determination that the average fee in quantum meruit analysis cases to be approximately $273,000 over a three-year period).

{14}     The Court has independently looked at the fee request in light of the factors commonly examined in shareholder class action fee applications. *See Wachovia,* 2003 NCBC 10 at 71-88.  A review of those factors, including causation and contribution, did not cause the Court to reduce the requested fee although there were clearly close questions involved.  There was no advocate for a different position.  For the

reasons set forth above, the Court approved the fee application.

## II.

{15}    The Court takes this opportunity to address one other issue that has been mooted for the most part by the agreement of plaintiffs' counsel to settle their fee dispute. It is an issue which may find more prevalence in the future.  The issue of whether or not the claim was meritorious when filed was mooted by the prima facie case created by the settlement structure. The Brualdi firm had filed a separate request asking to be awarded part of the fee agreed upon, based upon work performed by it prior to the court's selection of lead counsel. That dispute would also have raised the question of whether the original and first suit filed by Breakwater Partners within two days of the announcement and the obtaining of the temporary restraining order by Breakwater were meritorious.

{16}    The Court does not adopt a hard and fast rule that no work performed by non-lead counsel will ever be compensated. However, the Court will not compensate counsel who are not selected as lead counsel just because they filed a complaint or filed motions prior to class counsel being appointed. To do so would unnecessarily increase the litigation transaction costs. Class counsel who routinely practice in this area understand that there are some cases in which they will be appointed and some in which they will have no role. If they have no agreement with their clients to be compensated for the work they do, they assume a risk in rushing to the courthouse. The contingent risk factor is one of the reasons they are awarded a premium in many cases.

{17}    The selection of lead counsel is seldom based upon the first to file rule. Increasingly courts are looking for class representatives who have a substantial interest in the litigation and who will fulfill their role as class representatives. The courts are also looking for counsel who have given some thought and research to their complaints and have not just pulled a form out of the file and rushed to the courthouse. The Delaware Chancery Court has put an increasing emphasis on counsels' use of the right to inspect the books and records of the company *before* filing suit.

{18}    Delaware courts have "repeatedly urged derivative plaintiffs to seek books and records before filing a complaint."  *In Re The Walt Disney Company Derivative Litig.,* CA No. 15452, 2003 Del. Ch. LEXIS 52 at n.5 (Del. Ch. May 28, 2003) (citing *Guttman v. Jen-Hsun Huang,* C.A. No. 19571-NC, 2003 Del. Ch. LEXIS 48, at *1-2 (Del. Ch. May 5, 2003)).  Delaware's Inspection of Books and Records statute states in relevant part that "[a]ny stockholder . . . shall . . . have the right . . . to inspect for any proper purpose the corporation's stock ledger, a list of its stockholders, and its other books and records, and to make copies or extracts therefrom."  8 Del. C. § 220(b).  The statute defines a proper purpose as "a purpose reasonably related to such person's interest as a stockholder." *Id.*

{19}    In *Rales v. Blasband,* 634 A.2d 927 (1993), the Delaware Supreme Court was called on to determine whether "Blasband . . . alleged facts to show that demand is excused on the board of directors of Danaher Corporation, a Delaware Corporation[.]"  Blasband was a shareholder in Easco Hand Tools,

Inc. ("Easco") prior to 1990. In 1990, Easco became a wholly-owned subsidiary of Danaher Corporation ("Danaher"). The underlying derivative litigation was based on alleged "misuse by the Easco board of the proceeds of a sale of that company's 12.87% Senior Subordinated Notes." *Id.* at 930. Blasband alleged that "the defendants did not invest in government and other marketable securities" as promised in the prospectus. Instead, the board used the proceeds to buy "highly speculative junk bonds offered through Drexel Burnham Lambert Inc. . . . [and that] [t]hese junk bonds were bought by Easco . . . to help Drexel at a time when it was under investigation and having trouble selling such bonds." *Id.* at 931 (internal quotations omitted).

{20}    Although Blasband complained "that the . . . boards of directors refused to comply with his request for information regarding the investments[,] [there was] no indication that Blasband availed himself of 8 Del. C. § 220[.]" *Id.* at 931, n.4. The Court of Chancery speculated about the non-use of the books and records statute by plaintiffs in general. The Court of Chancery's speculation is worth quoting at length as it reflects similar thoughts held by this Court.

> Although derivative plaintiffs may believe it is difficult to meet the particularization requirement of *Aronson* because they are not entitled to discovery to assist their compliance with Rule 23.1, . . . they have many avenues available to obtain information bearing on the subject of their claims. . . . In addition, a stockholder who has met the procedural requirements and has shown a specific proper purpose may use the summary procedure embodied in 8 Del. C. § 220 to investigate the possibility of corporate wrongdoing. Surprisingly, little use has been made of section 220 as an information-gathering tool in the derivative context. Perhaps the problem arises in some cases out of an unseemly race to the court house, chiefly generated by the "first to file" custom seemingly permitting the winner of the race to be named lead counsel. The result has been a plethora of superficial complaints that could not be sustained. Nothing requires the Court of Chancery, or any other court having appropriate jurisdiction, to countenance this process by penalizing diligent counsel who has employed these methods, including section 220, in a deliberate and thorough manner in preparing a complaint that meets the demand excused test of *Aronson.*

*Id.* at 935 n. 10 (citing *Compaq Computer Corp. v. Horton*, 631 A.2d 1 (Del. 1993)).

{21}    The Court of Chancery repeated the Delaware Supreme Court's approval of using the books and records statute to gather sufficient facts to plead with particularity. *Ash v. McCall,* C.A. No. 17132, 2000 Del. Ch. LEXIS 144 n. 56 (Del. Ch. Sept. 15, 2000) ("I leave it to plaintiffs to adduce such facts through various pre-discovery fact-gathering methods they have at their disposal.") As the Delaware Supreme Court has repeatedly exhorted, shareholders plaintiffs should use the "tools at hand," most prominently § 220 books and records actions, to obtain information necessary to sue derivatively." (internal citations omitted)).

{22}    By May 5, 2003, the Court of Chancery had become increasingly vocal in chiding plaintiffs for failure to utilize the books and records statute. In dismissing a complaint for failure to make a demand under Delaware's derivative statutes, Vice Chancellor Strine stated: "Having failed to heed the numerous admonitions by our judiciary for derivative plaintiffs to obtain books and records before filing a

complaint, the plaintiffs have unsurprisingly submitted an amended complaint that lacks particularized facts compromising the impartiality of the NVIDIA board that would have acted on a demand." *Guttman v. Jen-Hsun Huang,* C.A. No. 19571-NC , 2003 Del. Ch. LEXIS 48, at *2 (Del. Ch. May 5, 2003). The Court further stated:

> These books and records could have provided the basis for the pleading of particularized facts . . . Rather than pursue that option, the plaintiffs, after confronting a motion to dismiss their original complaint, were content to simply amend their complaint in reliance upon the (now dismissed) federal complaints . . . They have thus ignored the repeated admonitions of the Delaware Supreme Court and this court for derivative plaintiffs to proceed deliberately and to use the books and records device to gather the materials necessary to prepare a solid complaint.

*Id.* at *34-35.

{23}     The Delaware cases of *Brehm v. Eisner,* 746 A.2d 244 (Del., 2000) and *In re The Walt Disney Company Derivative Litigation,* C.A. No. 15452, 2003 Del. Ch. LEXIS 52 (Del. Ch. May 28, 2003) clearly demonstrate the significant value of utilizing the Delaware books and records statute.

{24}     The Court of Chancery originally held "that the stockholder derivative complaint was subject to dismissal for failure to set forth particularized facts creating a reasonable doubt that the director defendants were disinterested and independent or that their conduct was protected by the business judgment rule." *Brehm,* 746 A.2d at 248. The Delaware Supreme Court remanded the case to the Court of Chancery "to provide plaintiffs a reasonable opportunity to file a further amended complaint consistent with this opinion." *Id.* In its opinion, the Supreme Court twice pointed out plaintiff's failure to use the books and records statute. First, in footnote 57 Chief Justice Veasey reminded plaintiffs that:

> It is no excuse for plaintiffs to argue that they are unable to allege these particularized facts because they are cut off from access to discovery at the pre-suit demand stage of a derivative suit. Plaintiffs have the opportunity to use the "tools at hand" to learn facts relating to [the issues at hand] or by seeking appropriate and precisely identified corporate records in a Section 220 proceeding.

*Id.* at 262 n. 57. Finally, the Chief Justice pointed out that a proceeding under Section 220 is a "summary one that should be managed expeditiously." *Id.* at 267. He also noted that "it is well established that investigation of mismanagement is a proper purpose for a Section 220 books and records inspection." *Id.* at n. 75 (quoting *Security First Corp. v. U.S. Die Casting & Dev. Corp.,* 687 A.2d 563, 567-69 (Del. 1997)).

{25}     *In re The Walt Disney Company* is the Court of Chancery's decision on remand. At this point, plaintiffs "had used a request for books and records as authorized under 8 Del. C. § 220, to obtain information about the nature of the Disney Board's involvement in the decision to hire and, eventually, to terminate Ovitz." *In re The Walt Disney Company,* 2003 Del. Ch. LEXIS at *5. The Court noted that "[t]he facts, as alleged in the new complaint, portray a markedly different picture of the corporate processes . . . than that portrayed in the first amended complaint." *Id.* at *5-6. The Court also pointed out that "[t]his case is yet another example where a books and records request in the first instance might have prevented expensive and time-consuming procedural machinations that too often occur in derivative

litigation." *Id.* at *6 n. 5 (citing *Guttman,* 2003 Del. Ch. LEXIS 48).

{26}   Although North Carolina's records statute is more detailed than Delaware's, it gives shareholders very similar rights.  It provides that a qualified shareholder of a corporation is entitled to inspect and copy any of the following corporate records:

> (1)      Its articles or restated articles of incorporation and all amendments to them currently in effect;
>
> (2)      Its bylaws or restated bylaws and all amendments to them currently in effect;
>
> (3)      Resolutions adopted by its board of directors creating one or more classes or series of shares, and fixing their relative rights, preferences, and limitations, if shares issued pursuant to those resolutions are outstanding;
>
> (4)      Minutes of all shareholders' meetings, and records of all action taken by shareholders without a meeting, for the past three years;
>
> (5)      All written communications to shareholders generally within the past three years and the financial statements required to be made available to the shareholders for the past three years under G.S. 55-16-20;
>
> (6)      A list of the names and business addresses of its current directors and officers; and
>
> (7)      Its most recent annual report delivered as required by G.S. 55-16-22.

N.C.G.S. § 55-16-01(e) (2002); N.C.G.S. § 55-16-02(a) (2002).  Upon following the proper procedures outlined in the statute, a qualified shareholder may also inspect and copy:

> (1)    Records of any final action taken with or without meeting by the board of directors, or by a committee of the board of directors while acting in place of the board of directors on behalf of the corporation, minutes of any meeting of the shareholders and records of action taken by the shareholders without a meeting . . . ;
>
> (2)    Accounting records of the corporation; and
>
> (3)    The record of shareholders.

N.C.G.S. § 55-16-02(b).  The right to inspect is limited if the corporation "determines in good faith [that the disclosure will] adversely affect the corporation in the conduct of its business or may constitute material nonpublic information[.]"  *Id.*  The check on this limitation would be an action under this statute asking a court "to compel the production of corporate records for examination."  N.C.G.S. § 55-16-02(e) (2).

{27}   Our Supreme Court has indicated that a proper purpose could include "determining any possible mismanagement of the Company or any possible misappropriation, misapplication or improper use of any property or asset of the Company[.]"  *Parsons v. Jefferson-Pilot Corp.,* 333 N.C. 420, 429, 426 S.E.2d 685, 691 (1993) (holding that the quoted language met the particularity requirements under the circumstances of the case.).

{28}   Failure to use inspection of books and records may result in a finding that the  suit was not meritorious when filed.  The plaintiff who waits to see what action the board takes and then files a complaint based upon actual activity rather than speculation about what the board might do may be the better selection as class representative. Certainly courts will look more closely at the quality of the

complaint than the time of its filing and will look to see what investigation supports the filing of the complaint.

## III.

{29}     Finally, the court addresses one issue raised by an objection to the fee. The public is suspicious of large legal fees. In this case as in many others where the board has fulfilled its duties and the shareholders have voted on a proposed merger, the settlement provides for the payment of legal fees and includes a release of any shareholder claims. To the public it appears that the shareholders are the only ones giving up anything and that the lawyers are walking away with the money. It is an understandable reaction based upon the language of the settlements and the notices which go out. The payment to counsel is not a quid pro quo for the release, although it may appear so. The payment is for some service of value performed, and the release serves to end the litigation and insure consummation of the transaction where the court has determined that the shareholders have no further claim. Here, the auction insured that the shareholders got the best possible price. The board fulfilled its fiduciary duties. The lawyers who represented the class performed some services of value for which the company agreed to provide compensation, and the shareholders' price was not diminished in any way. By providing fees to counsel where some service of value to the shareholders has been performed, the Court insures that there is a check on management which encourages good sound corporate governance. In order to approve the settlement, the Court had to be convinced that the shareholders received both the fulfillment of the directors' fiduciary duties and the best price a free market would offer for their stock.  The release served to conclude the litigation once and for all, giving both the Company and the Court assurance that the litigation agency costs were capped.  In approving the settlement, the Court is fulfilling its obligation to balance the need for incentives for shareholders to protect their interest with the need to keep litigation costs at a level which does not inhibit merger activity. That merger activity often creates the most realizable value for shareholders.

SO ORDERED this the 19th day of December 2003.

---

[i] In *In Re Delhaize America, Inc. Shareholders Litigation*, 00 CVS 13706, the Board agreed to pay class counsel monitoring the actions of the Special Committee a fee that was almost five times the amount paid to the members of the Special Committee who actually did the work resulting in the increased share price. In that case, as in this case, the company provided the Court with no reason to reduce or disapprove the fee.