# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

EQUITY-LEAGUE PENSION TRUST FUND, derivatively on behalf of WAYFAIR INC.,

Plaintiff,

v.

GREAT HILL PARTNERS, L.P., GHEP VII AGGREGATOR, L.P., CHARLESBANK CAPITAL PARTNERS, LLC, CBEP INVESTMENTS, LLC, NIRAJ SHAH, JULIE BRADLEY, STEVEN CONINE, ROBERT GAMGORT, ANDREA JUNG, MICHAEL KUMIN, JAMES MILLER, JEFFREY NAYLOR, and ANKE SCHÄFERKORDT,

Defendants,

and

WAYFAIR INC.,

Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2020-0992-SG

## MEMORANDUM OPINION

Date Submitted: August 23, 2021
Date Decided: November 23, 2021

Corinne Elise Amato, Kevin H. Davenport, and Jason W. Rigby, of PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; OF COUNSEL: Eric L. Zagar and Matthew C. Benedict, of KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; and Patrick C. Lynch, of LYNCH & PINE, Providence, Rhode Island, *Attorneys for Plaintiff Equity-League Pension Trust Fund.*

Paul J. Lockwood, Jenness E. Parker, Jacob J. Fedechko, and Trevor T. Nielsen, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Wilmington, Delaware, *Attorneys for Defendants Julie Bradley, Robert Gamgort, Andrea Jung, James Miller, Jeffrey Naylor, Anke Schäferkordt, and Wayfair Inc.*

John L. Reed, Ronald N. Brown, III, Peter H. Kyle, and Kelly L. Fruend, of DLA PIPER LLP (US), Wilmington, Delaware, *Attorneys for Defendants Great Hill Partners, L.P., GHEP VII Aggregator, L.P., and Michael Kumin.*

Rudolf Koch, Matthew D. Perri, and Andrew L. Milam, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Roberto M. Braceras, Caroline H. Bullerjahn, John A. Barker, and Dylan E. Schweers, of GOODWIN PROCTER LLP, Boston, Massachusetts, *Attorneys for Defendants Niraj Shah and Steven Conine.*

Kurt M. Heyman and Gillian L. Andrews, of HEYMAN ENERIO GATTUSO & HIRZEL, LLP, Wilmington, Delaware; OF COUNSEL: Brandon F. White, Euripides Dalmanieras, and Leah S. Rizkallah, of FOLEY HOAG LLP, Boston, Massachusetts, *Attorneys for Defendants Charlesbank Capital Partners, LLC and CBEP Investments, LLC.*

**GLASSCOCK, Vice Chancellor**

The decision if, how and when to take on company debt is a quintessential function of the board of directors. This is a purported derivative suit brought on behalf of Wayfair Inc. ("Wayfair" or the "Company") to challenge the issuance of $535 million in convertible debt (the "Transaction") to The Spruce House Partnership LLC ("Spruce House") and subsidiaries of Charlesbank Capital Partners, LLC ("Charlesbank") and Great Hill Partners, L.P. ("Great Hill"). A committee of the board recommended, and the board of directors approved the transaction at a time of marked market turmoil and general uncertainty in the retail sales business, which is Wayfair's business, resulting from the onset of the COVID-19 pandemic.

Before me are the Defendants' Motions to Dismiss under Rule 23.1. The Plaintiff, a Wayfair stockholder, failed to make a demand on the Wayfair board to bring this litigation, as required by Rule 23.1. Thus, the Defendants' Motions must be granted unless the Complaint pleads specific facts that, if true, raise a reasonable doubt that the Directors could have brought their business judgment to bear on behalf of Wayfair to consider a demand. Wayfair is alleged to be a controlled entity, and the Transaction was allegedly conflicted. Nonetheless, the burden remains on the Plaintiff to demonstrate that demand is excused. At issue are three independent directors who formed the audit committee, charged with reviewing conflicted transactions. If these directors are able to apply their business judgment on

Wayfair's behalf, demand is not excused; if they cannot, they and other directors alleged to be interested in the Transaction form a majority of the board, and Rule 23.1 is satisfied. The Plaintiff points only to the alleged liability of these audit committee directors as raising a reasonable doubt as to their disinterest in the Transaction.

Upon a review of the facts pled, it is clear that the Transaction, as characterized in the Complaint, was far from a model of best practices. It appears to have been rushed, in light of fears (not, perhaps, without reason) of a continuing crisis in the market caused by the pandemic. But to find sufficient likelihood of liability on the part of these directors to excuse demand, that is insufficient. In light of the Company's exculpation clause, the Complaint, to be successful, must plead bad faith on the audit committee directors' part. As explained below, the allegations in the Complaint are insufficient to indicate bad faith, such that demand would have been futile; accordingly, the Motion to Dismiss is granted.

# I. BACKGROUND[1]

## A. The Parties and Relevant Non-Parties

Plaintiff Equity-League Pension Trust Fund is a pension fund that has beneficially owned shares of Wayfair Class A common stock continuously since before the Transaction.[2]

Nominal Defendant Wayfair is an online retailer of home goods with operations in North America and Europe.[3] Wayfair was founded in 2002, and it was incorporated in Delaware in 2014.[4] Wayfair has two classes of common stock: Class A, which is traded on the New York Stock Exchange (the "NYSE") and entitles holders to one vote per share; and Class B, which is not publicly traded, and entitles holders to ten votes per share.[5] Wayfair identifies as a "controlled" company under the NYSE corporate governance standards.[6]

---

[1] Unless otherwise noted, the facts referenced in this Memorandum Opinion are drawn from the Verified Derivative Complaint (referred to herein as the "Complaint") and the documents incorporated therein. *See generally* Compl., Dkt. No. 1. I may also consider documents produced by the Defendants in response to the Plaintiff's 8 Del. C. § 220 books and records demand "to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020). Citations in the form of "Fedechko Decl. —" refer to the Transmittal Declaration of Jacob J. Fedechko in Support of the Independent Directors' Opening Br. in Supp. of their Mot. to Dismiss the Verified Derivative Compl., Dkt. No. 28. Citations in the form of "Fedechko Decl., Ex. —" refer to the exhibits attached to the Fedechko Declaration, Dkt. No. 28.

[2] Compl. ¶ 25.

[3] *Id.* ¶ 26.

[4] *Id.*

[5] *Id.*

[6] *Id.*

Defendant Great Hill is a Delaware limited partnership located in Boston, Massachusetts.[7] Great Hill invests in high-growth mid-market companies.[8] According to the Complaint, Great Hill demands board representation at every company in its portfolio, including Wayfair.[9] Defendant Kumin serves as Great Hill's designee on the Wayfair board of directors (the "Board").[10] As of April 17, 2020, Great Hill beneficially owned 4,277,786 shares of Wayfair Class A common stock.[11]

Defendant GHEP VII Aggregator, L.P. ("GHEP") is a Delaware limited partnership that is wholly owned by Great Hill.[12] GHEP was formed for the purpose of effectuating the Transaction.[13]

Defendant Charlesbank is a Massachusetts limited liability company based in Boston, Massachusetts that provides investment advisory and management services.[14]

---

[7] *Id.* ¶ 27.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.* ¶ 28.
[13] *Id.*
[14] *Id.* ¶ 29.

Defendant CBEP Investments, LLC ("CBEP") is a Delaware limited liability company.[15]  CBEP and its manager are beneficially owned by Charlesbank.[16]  CBEP is the investment vehicle utilized by Charlesbank to effectuate the Transaction.[17]

Great Hill, GHEP, Charlesbank, and CBEP are collectively referred to as the "Noteholder Defendants."

Defendant Julie Bradley has been a member of the Board since September 2012 and has chaired the Board's audit committee (the "Audit Committee") since its inception.[18]

Defendant Steven Conine co-founded Wayfair in 2002 and has served as a director and as co-Chairman of the Board since then.[19]  He also served as the Company's Chief Technology Officer ("CTO") until 2015.[20]  At the time of the Transaction, Conine owned 613,600 shares of Wayfair Class A common stock and 13,465,948 shares of Wayfair Class B common stock,[21] as well as limited partnership interests in Great Hill and Charlesbank.[22]

---

[15] *Id.* ¶ 30.
[16] *Id.* ¶¶ 29, 30.
[17] *Id.* ¶ 30.
[18] *Id.* ¶ 32.
[19] *Id.* ¶ 33.
[20] *Id.*
[21] *Id.*
[22] *Id.* ¶ 97.

Defendant Robert Gamgort served as a member of the Board from February 2015 until May 12, 2020.[23]

Defendant Andrea Jung has served as a member of the Board since May 2018.[24]

Defendant Michael Kumin has been a member of the Board since June 2011.[25] Since October 2014, Kumin has been the Company's lead independent director, compensation committee chairman, and nominating and governance committee chairman.[26]  Kumin has also been employed at Great Hill since 2002, which designated him to serve on the Wayfair Board.[27]

Defendant James Miller served as a member of the Board from July 2016 until April 20, 2020.[28]  Miller also served as a member of the Audit Committee until August 1, 2019, when he became Wayfair's interim CTO.[29]  Two weeks after the Transaction was announced, he became Wayfair's permanent CTO.[30]

Defendant Jeffrey Naylor has served as a member of the Board since January 2018, and as a member of the Audit Committee since shortly thereafter.[31]  Naylor

---

[23] *Id.* ¶ 34.
[24] *Id.* ¶ 35.
[25] *Id.* ¶ 36.
[26] *Id.*
[27] *Id.*
[28] *Id.* ¶ 37.
[29] *Id.*
[30] *Id.*
[31] *Id.* ¶ 38.

also served as a member of the ad hoc transaction committee of the Board that was formed for the purpose of negotiating and executing the terms of the Transaction (the "Transaction Committee").[32]

Defendant Anke Schäferkordt has served as a member of the Board and the Audit Committee since September 17, 2019.[33]

Defendant Niraj Shah co-founded Wayfair in 2002.[34] Since then, he has served as Wayfair's Chief Executive Officer ("CEO") and President, and as a director and co-Chairman of the Board.[35] At the time of the Transaction, Shah beneficially owned 613,500 shares of Wayfair Class A common stock and 13,465,108 shares of Wayfair Class B common stock,[36] as well as limited partnership interests in Great Hill and Charlesbank.[37] The Complaint alleges that Shah and Conine together control a majority of the voting power of the Company's common stock.[38]

Defendants Bradley, Conine, Gamgort, Jung, Kumin, Miller, Naylor, Schäferkordt, and Shah are collectively referred to herein as the "Director

---

[32] *Id.* ¶¶ 14, 38.
[33] *Id.* ¶ 39.
[34] *Id.* ¶ 40.
[35] *Id.*
[36] *Id.*
[37] *Id.* ¶ 97.
[38] *Id.* ¶¶ 1, 10, 33, 40, 48, 139.

Defendants." The Director Defendants and the Noteholder Defendants are collectively referred to herein as the "Defendants."

Non-party Michael Sneed has served as a member of the Board since November 11, 2020.[39]

### B. Factual Background

Wayfair has expanded significantly since its founding in 2002.[40] By the end of 2019, Wayfair employed nearly 17,000 full-time employees and generated over $9 billion in annual net revenue.[41] But the Company had not yet achieved profitability.[42] In late 2019 and early 2020, according to the Complaint, Wayfair undertook a series of cutbacks and cost-cutting measures in order to streamline the Company, position itself for long-term profitability, and become less dependent on Chinese manufacturing.[43] On February 13, 2020, for instance, Wayfair laid off 3% of its global workforce and cancelled its participation in upcoming college recruiting events.[44]

The Company's financial forecasts, which reflected these recent modifications to its operations, projected optimistic results over the next six years.[45]

---

[39] *Id.* ¶ 115.
[40] *See id.* ¶¶ 43–47, 50, 53.
[41] *Id.* ¶ 53.
[42] *Id.* ¶ 68.
[43] *Id.* ¶¶ 55–56, 58.
[44] *Id.* ¶ 57.
[45] *See id.* ¶¶ 59–63.

On February 20, 2020, Wayfair's management provided the Board with forecasts through 2026 that presented three sets of six-year financial projections.[46] First, the forecast discussed the "NSS 2/15/20 Case," which the forecast described as "[m]ore of a 50/50 case for revenue growth, with top line reaccelerating to 30% by Q4 2020."[47] Second, the forecast discussed a "20% Revenue Growth Case," which the forecast described as "conservative."[48] Finally, the forecast discussed a "Recession Case" that assumed a "severe recession" lasting until 2021.[49] The Recession Case projected positive EBITDA and $3.278 billion in net revenue for the fourth quarter of 2021, and by 2026, over $30 billion in net revenue and $2 billion in EBITDA annually.[50] Thus, according to the Complaint, Wayfair management projected optimistic long-term financial results even under the worst-case scenario forecast.[51]

But these forecasts did not account for a global pandemic. In late February and March 2020, an exponential rise in detected cases of COVID-19 sparked panic on Wall Street and wreaked havoc on the global economy.[52] On February 27, 2020, a week after Wayfair management presented the optimistic forecast to the Board, the Dow Jones Industrial Average suffered its largest ever one-day decline.[53] It would

---

[46] *Id.* ¶ 59.
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.* ¶¶ 60–61.
[51] *Id.* ¶¶ 5, 60–61, 64.
[52] *See id.* ¶¶ 6, 8, 71.
[53] *Id.* ¶ 71.

9

go on to break that record five more times between March 9, 2020 and March 18, 2020.[54] According to the Complaint, the downturn in the stock market was more severe than in any period since the Great Depression.[55]

During this time, furniture retailers—brick-and-mortar and online alike— were hampered by the economic impact of the COVID-19 pandemic.[56] Brick-and-mortar stores closed due to government-mandated quarantines.[57] Meanwhile, online retailers such as Amazon delayed shipments of "non-essential" items by up to a month.[58] Wayfair's stock price fell from over $72.50 per share on February 24, 2020 to $23.52 per share on March 19, 2020.[59]

Amid this economic maelstrom, Wayfair began negotiating a private investment in public equity ("PIPE") transaction to raise $500 million through the issuance and sale of convertible notes,[60] which culminated in the Transaction. Wayfair was not alone in this endeavor. In April 2020, for instance, U.S. corporations sold over $300 billion in debt, breaking the previous monthly record.[61]

---

[54] *Id.*
[55] *Id.* ¶ 78.
[56] *See id.* ¶ 69.
[57] *Id.* ¶¶ 68–69.
[58] *Id.* ¶ 69.
[59] *Id.* ¶¶ 4, 71.
[60] *Id.* ¶ 73.
[61] *Id.* ¶ 75.

Companies raised approximately the same amount in convertible debt financings in the second quarter of 2020 as they had during all of 2019.[62]

### 1. Wayfair Negotiates the Transaction

According to the Complaint, Wayfair began negotiating the Transaction in early March 2020. On March 4, 2020, Kumin, on behalf of Great Hill, executed a non-disclosure agreement with Wayfair "in connection with a business/investor relationship."[63] The next day, Great Hill purchased 829,510 shares of Wayfair Class A common stock.[64] On March 18, 2020, Wayfair invited eight private equity firms to submit indications of terms for a $500 million investment in convertible notes.[65] Seven of the eight firms expressed interest, and five of those executed non-disclosure agreements, in addition to Great Hill.[66]

By March 29, 2020, Wayfair had received preliminary term sheets from four firms.[67] Because of the drastic changes in Wayfair's stock price from day to day amidst the stock market's unprecedented volatility, the premiums of these offers over the market price of Class A common stock varied significantly, even though the offers came in just days apart.[68] On March 24, 2020, one bidder ("Bidder One")[69]

---

[62] *Id.*
[63] *Id.* ¶ 65.
[64] *Id.* ¶ 66.
[65] *Id.* ¶¶ 13, 76–77.
[66] *Id.* ¶ 77.
[67] *Id.*
[68] *Id.* ¶¶ 78–80.
[69] The identity of this bidder remains under seal.

offered a conversion price of $65, which represented a 115% premium relative to the prior day's closing price.[70] Three days later, on March 27, 2020, Great Hill submitted a term sheet that reflected a $68.85 conversion price, which was a 25% premium to the prior day's closing market price.[71] Charlesbank submitted a bid two days later that reflected a lower conversion price of $62.50, but was a 35% premium to the then-current market price.[72]

Although Great Hill and Charlesbank each initially proposed purchasing up to $250 million in convertible notes, they paired up on March 30, 2020 and began conducting due diligence in preparation of a joint revised bid.[73] Bidder One, meanwhile, offered to invest the full $500 million alone, though it was "OK . . . to bring in an insider."[74] On March 31, 2020, Great Hill and Charlesbank submitted a joint offer featuring a $72.50 conversion price,[75] and Bidder One indicated that it still "need[ed] to complete diligence with [its] operating partners."[76]

2. The Board Reviews and Approves the Transaction

According to the Complaint, the Board became involved in the Transaction on March 31, 2020.[77] By written consent, the Board established the Transaction

---

[70] Id. ¶ 80.
[71] Id.
[72] Id.
[73] Id. ¶ 81.
[74] Id. ¶ 82.
[75] Id. ¶ 84.
[76] Id.
[77] Id. ¶ 85.

Committee, composed of directors Naylor and Miller.[78] At the time, Miller was Wayfair's interim CTO, and he was therefore not considered independent under the NYSE standards of corporate governance.[79] The written consent delegated the Transaction Committee the following authority to conduct a transaction process:

> [E]xercise all of the powers of the Board in connection with (i) the Private Offering, (ii) the timing of the Private Offering, (iii) the issuance and sale of the Securities and the terms thereof, (iv) the engagement of any financial advisor or placement agent . . . in connection with the Private Offering and (v) any and all matters incident thereto, including, without limitation, the power to negotiate with potential investors for the purpose of determining the terms and conditions of the Private Offering, the preparation of any documentation to be used in connection therewith, the aggregate size of the Private Offering (including, without limitation, the principal amount of any convertible notes), the price(s) to be received by the Company for the Securities and Placement Agent discounts and commissions, to determine conclusively the structural elements of the Private Offering, including, without limitation, any maturity date(s), the issue price(s), the interest rate(s) (including any contingent interest), the ranking(s), the redemption and repurchase prices (including any premium) and the conversion rate(s) and conversion terms of any convertible notes, and to take all such other actions as the Transaction Committee deems necessary, appropriate or desirable to commence and consummate the Private Offering[.][80]

---

[78] *Id.*
[79] *Id.* ¶ 86.
[80] *Id.* ¶ 88.

As discussed above, however, Wayfair's management had already begun the transaction process, including by hiring financial and legal advisors and identifying prospective financiers.[81] As a result, the written consent also ratified the work that Wayfair's management had already done "as if such actions had been presented to th[e] Board for its approval prior to such actions being taken."[82] The Complaint alleges that the Transaction Committee did not hire its own advisors, revisit any of management's prior determinations about the timing of the Transaction, or attempt to contact any of the other firms that submitted bids.[83]

On April 2, 2020, Bidder One submitted a revised offer on the same terms as the offer from Great Hill and Charlesbank.[84] The same day, Wayfair management also invited two large Wayfair stockholders to participate in the Transaction, including Spruce House.[85] Spruce House ultimately joined the Transaction, purchasing an additional $35 million in convertible notes as part of the consortium with Great Hill and Charlesbank.[86]

Three days later, on April 5, 2020, the Transaction Committee met for twenty-five minutes, along with Conine, Shah, six other members of management,

---

[81] Id. ¶ 89.
[82] Id. ¶ 90.
[83] Id. ¶ 91.
[84] Id. ¶ 92.
[85] Id.
[86] Id. ¶¶ 2, 104.

and Wayfair's financial advisor, Goldman Sachs & Co. ("Goldman Sachs").[87] At this meeting, management and Goldman Sachs informed the Transaction Committee of the latest negotiation developments and agreement terms.[88] The Transaction Committee then approved eleven resolutions recommending that the Board approve the Transaction without any changes to the terms or form presented by Wayfair's management.[89] The resolutions were prefaced by a statement that "Mr. Niraj Shah and Mr. Steven Conine hold limited partner interests in [Charlesbank] and [Great Hill]."[90] The preface also recognized Miller and Naylor as "disinterested directors."[91]

Thirty-five minutes later, the Board met to discuss the Transaction, along with Goldman Sachs and Wayfair's legal advisor.[92] Defendant Kumin recused himself from the meeting.[93] Management requested that the Board approve the Transaction in time for the Company to announce it before the market opened the next morning.[94] Goldman Sachs delivered a presentation concerning the Transaction, which provided an overview and timeline of the negotiation process, summarized discussions with ten potential investors, and compared the key terms of the proposed offer from

---

[87] *Id.* ¶ 93.
[88] *Id.*
[89] *Id.*
[90] *Id.* ¶ 94.
[91] *Id.* ¶ 95.
[92] *Id.* ¶ 96.
[93] *Id.*
[94] *Id.*

Charlesbank, Great Hill and Spruce House against the key terms of the offer from Bidder One.[95] The presentation noted that Wayfair was exploring a PIPE transaction "to bolster its balance sheet and liquidity position, at a time of heightened market volatility and uncertainty about the prolonged impact of COVID-19."[96] The presentation also noted that the offer from Great Hill, Charlesbank and Spruce House featured a conversion price of $72.50 per share, while the offer from Bidder One featured a conversion price of $65 per share.[97]

A half-hour into the meeting, the Board took a five minute break, during which the Audit Committee unanimously passed a resolution approving the Transaction.[98] The Audit Committee meeting minutes stated that this resolution "had been provided in advance to the [Audit] Committee."[99] Like the resolution passed by the Transaction Committee, the Audit Committee resolution included a preface stating that "it has been disclosed and made known to the [Audit] Committee that two of the Company's directors, Mr. Niraj Shah and Mr. Steven Conine, hold limited partner interests in [Great Hill] and [Charlesbank], and another of the Company's directors, Mr. Michael Kumin, is a member of the managing committee of [Great Hill]."[100] The preface further stated that "the terms of the Transaction have

---

[95] *See* Fedechko Decl., Ex. 3.
[96] *See id.* at WAYFAIR-220-0000036.
[97] Compl. ¶ 96.
[98] *Id.* ¶ 97.
[99] *See* Fedechko Decl., Ex. 6 at WAYFAIR-220-0000004.
[100] *Id.*; *see also* Compl. ¶ 97.

16

been reviewed and negotiated by a Transaction Committee of the Board composed entirely of disinterested directors."[101] The preface also stated that the following details about the Transaction were "provided" or "presented" to the Audit Committee "in advance":

> (i) the principal terms of the Securities to be set forth in the Indenture . . . , (ii) the proposed indenture between the Company and the . . . trustee . . . , (iii) the principal terms of one or more purchase agreements between the Company and the Investors pursuant to which the Company will issue and sell to the Investors up to $535,000,000 aggregate principal amount of Securities, (iv) the principal terms of a registration rights agreement between the Company and the Investors, and (v) a summary of the process by which the Transaction was identified and negotiated by Goldman Sachs, the Company's financial advisor, members of the Company's management team, and the Transaction Committee.[102]

After the Audit Committee approved the resolution, the full Board resumed its meeting and voted to approve the Transaction.[103] The following day, on April 6, 2020, Wayfair issued a press release announcing the Transaction and disclosing positive financial results for late March and early April.[104] As part of the Transaction, Wayfair granted Great Hill and Charlesbank the right to each designate

---

[101] Compl. ¶ 97; *see also* Fedechko Decl., Ex. 6 at WAYFAIR-220-0000004.
[102] Fedechko Decl., Ex. 6 at WAYFAIR-220-0000005.
[103] Compl. ¶ 98.
[104] *Id.* ¶ 100.

a nominee for election to the Board.[105]  Great Hill designated Kumin, and Charlesbank selected its CEO, Michael Choe.[106]

In the ensuing months, Wayfair's stock price rose significantly.  By May 5, 2020, Wayfair's stock had risen to $31.77 per share, and within a week it traded above $190 per share.[107]  By August 5, 2020, Wayfair's stock price was over $300 per share.[108]

*C. Procedural History*

The Plaintiff initiated this action on November 18, 2020.[109]  The Complaint brings breach of fiduciary duty claims against Defendants Conine and Shah (Count I) and the Director Defendants (Count II) and an unjust enrichment claim against the Noteholder Defendants (Count V) relating to the Transaction.[110]  The Complaint also brings a *Brophy* insider trading claim against Defendant Kumin (Count III) and unjust enrichment claims against Defendants Kumin and Great Hill (Count IV) in connection with Great Hill's March 5, 2020 purchase of Wayfair stock.[111]  On February 16, 2021, the Defendants filed four separate motions to

---

[105] *Id.* ¶ 103.
[106] *Id.*
[107] *Id.* ¶ 108.
[108] *Id.* ¶ 109.
[109] *See id.*
[110] *See id.* ¶¶ 138–47, 157–60.
[111] *See id.* ¶¶ 148–56.

dismiss the Complaint (the "Motions to Dismiss"),[112] along with supporting opening briefs.[113]  The Plaintiff filed an omnibus answering brief in opposition to the Motions to Dismiss on April 13, 2021.[114]  On May 11, 2021, the Defendants filed reply briefs in further support of the Motions to Dismiss.[115]  The parties submitted supplemental authorities on August 6, 2019,[116] August 19, 2021[117] and August 23, 2021.[118]

On August 23, 2021, I heard oral argument on the Motions to Dismiss, and I consider the Motions to Dismiss submitted for decision as of that date.  During oral argument, the Plaintiff released the *Brophy* claim against Defendant Kumin, and I consider that claim to be dismissed.[119]

---

[112] *See* Defs. Great Hill Partners, L.P., GHEP VII Aggregator, L.P., and Michael Kumin's Mot. Dismiss Pl.'s Verified Derivative Compl., Dkt. No. 23; Defs. Niraj Shah and Steven Conine's Mot. Dismiss Verified Derivative Compl., Dkt. No. 25; Independent Directors' Mot. Dismiss Verified Derivative Compl., Dkt. No. 28; Defs. Charlesbank Capital Partners, LLC and CBEP Investments, LLC's Mot. Dismiss, Dkt. No. 29.

[113] *See* Opening Br. Supp. Defs. Great Hill Partners, L.P., GHEP VII Aggregator, L.P., and Michael Kumin's Mot. Dismiss Pl.'s Verified Derivative Compl., Dkt. No. 23; Opening Br. Supp. Defs. Niraj Shah and Steven Conine's Mot. Dismiss Verified Derivative Compl., Dkt. No. 26; Independent Directors' Opening Br. Supp. Mot. Dismiss the Verified Derivative Compl., Dkt. No. 28; Opening Br. Supp. Defs. Charlesbank Capital Partners, LLC and CBEP Investments, LLC's Mot. Dismiss, Dkt. No. 30.

[114] Pl.'s Omnibus Answering Br. Opp. Defs.' Mots. Dismiss Verified Derivative Compl., Dkt. No. 41 [hereinafter "Pl.'s Answering Br."].

[115] Reply Br. Supp. Defs. Great Hill Partners, L.P., GHEP VII Aggregator, L.P., and Michael Kumin's Mot. Dismiss Pl.'s Verified Derivative Compl., Dkt. No. 49; Reply Br. Further Supp. Defs. Niraj Shah and Steven Conine's Mot. Dismiss Verified Derivative Compl., Dkt. No. 52; Independent Directors' Reply Br. Further Supp. Mot. Dismiss Verified Derivative Compl., Dkt. No. 50; Reply Br. Supp. Defs. Charlesbank Capital Partners, LLC and CBEP Investments, LLC's Mot. Dismiss Verified Derivative Compl., Dkt. No. 48.

[116] Dkt. No. 63.

[117] Dkt. No. 68.

[118] Dkt. No. 69.

[119] *See* Tr. Oral Arg. Defs.' Mots. Dismiss, Dkt. No. 71 at 80:6–81:15.

## II. ANALYSIS

### A. Legal Standards

Under Delaware law, "'directors, rather than shareholders, manage the business and affairs of the corporation.'"[120] "The board's authority to govern corporate affairs extends to decisions about what remedial actions a corporation should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider."[121]

A derivative action, like this one, "encroaches 'on the managerial freedom of directors' by seeking to deprive the board of control over a corporation's litigation asset."[122] "'In order for a stockholder to divest the directors of their authority to control the litigation asset and bring a derivative action on behalf of the corporation, the stockholder must' (1) make a demand on the company's board of directors or (2) show that demand would be futile."[123] The demand requirement "is a substantive requirement that '[e]nsure[s] that a stockholder exhausts his intracorporate remedies,' 'provide[s] a safeguard against strike suits,' and 'assure[s] that the

---

[120] *United Food and Com. Workers Union and Participating Food Indus. Emps. Tri-State Pension Fund v. Mark Zuckerberg et al.*, 2021 WL 4344361, at *6 (Del. Sept. 23, 2021) (quoting *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).

[121] *Id.*

[122] *Id.* (quoting *Aronson*, 473 A.2d at 811).

[123] *Id.* (quoting *Lenois v. Lawal*, 2017 WL 5289611, at *9 (Del. Ch. Nov. 7, 2017)).

stockholder affords the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which does occur.'"[124]

A shareholder seeking to assert a derivative claim must, under Court of Chancery Rule 23.1, "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[125] "Rule 23.1 is not satisfied by conclusory statements or mere notice pleading. On the other hand, the pleader is not required to plead evidence. What the pleader must set forth are particularized factual statements that are essential to the claim."[126] "When considering a motion to dismiss a complaint for failing to comply with Rule 23.1, the Court does not weigh the evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor."[127] Where a demand has not been made, only if, in light of the allegations and the inferences therefrom, the complaint fails to raise a reasonable doubt that the board could act on behalf of the corporation in considering a demand, may a motion to dismiss under Rule 23.1 be granted.[128]

---

[124] *Id.* (quoting *Lenois*, 2017 WL 5289611, at *9).
[125] Ct. Ch. R. 23.1(a).
[126] *Brehm*, 746 A.2d at 254.
[127] *Zuckerberg*, 2021 WL 4344361, at *7.
[128] *See id.*

*B. The Complaint Does Not Plead with Particularity that A Pre-Suit Demand Would Be Futile*

The Plaintiff did not make a demand on the Board to institute this action.[129] Therefore, to survive a motion to dismiss under Rule 23.1, the Plaintiff must plead with particularity that demand would be futile. That inquiry is satisfied if, given the truth of the particularized facts alleged and the reasonable inferences therefrom, the Complaint creates a reasonable doubt that a majority of the Board is able to "bring [its] business judgment to bear" on behalf of the Company to assess the substance of the demand.[130] This Court considers the following factors, on a director-by-director basis, in assessing whether demand would be futile:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[131]

---

[129] *See* Compl. ¶¶ 111–37.
[130] *Ryan v. Armstrong*, 2017 WL 2062902, at *2 (Del. Ch. May 15, 2017), *aff'd*, 176 A.3d 1274 (Del. 2017).
[131] *Zuckerberg*, 2021 WL 4344361, at *17.

Demand is excused if the Court determines that, for at least half of the members of the demand board, the answer to any of these questions is "yes."[132]

The Plaintiff does not dispute that Defendant Jung and director Sneed could bring their business judgment to bear with respect to a pre-suit demand.[133] The Plaintiff contends, however, that the other seven members of the nine-member Board that would consider any demand are incapable of bringing their business judgment to bear on a demand to initiate this action, such that demand is excused.[134] Namely, the Plaintiff contends that Directors Choe, Shah, Conine, and Kumin are interested in the Transaction because they each participated on the buy-side,[135] and that Defendants Bradley, Naylor and Schäferkordt, the three members of the Audit Committee, face a substantial likelihood of liability for bad faith in connection with their review and approval of the Transaction.[136]

I assume for purposes of the Motions to Dismiss that Choe, Shah, Conine and Kumin were interested and thus unable to consider a demand. The Plaintiff,

---

[132] *Id.*

[133] *See* Pl.'s Answering Br. at 45–58. The Plaintiff initially asserted in the Complaint that eight members of the demand Board could not consider a demand, including Defendant Jung. *See* Compl. ¶¶ 115, 131–37. The Plaintiff's Answering Brief, however, asserts that only seven members of the demand Board could not adequately consider a demand, and does not dispute the independence or disinterestedness of Defendant Jung. *See* Pl.'s Answering Br. at 45–58. *See* *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[134] *See* Pl.'s Answering Br. at 45.

[135] *Id.* at 46; Compl. ¶¶ 116–26.

[136] Pl.'s Answering Br. at 46–58; Compl. ¶¶ 127–30.

23

however, must through particular pleading raise a reasonable doubt regarding at least one additional Director to survive the Motions to Dismiss. Having conceded the ability of Jung and Sneed to consider the demand, the Plaintiff must point to disabling interests of one of the remaining three Directors. The Plaintiff points only to those Directors' service on the Audit Committee and posits that the likelihood of liability arising from that service is such that they are disabled from considering demand.[137] The Audit Committee existed in part to review and authorize related party transactions,[138] and under Wayfair's policies and procedures, it was charged with considering "the extent of the related party's interest in the transaction" and "whether the transaction is on terms comparable to those that could be obtained in an arm's length transaction."[139] The Plaintiff contends that the members of the Audit Committee face a substantial likelihood of liability arising from their alleged failure to perform these duties.[140] On review of the allegations, I disagree.

The Complaint does not plead with particularity that any of the three members of the Audit Committee—Bradley, Naylor or Schäferkordt—face a substantial likelihood of liability regarding the Transaction. The Complaint does not allege that the Audit Committee Defendants were interested in the Transaction or lacked

---

[137] Pl.'s Answering Br. at 46–58; Compl. ¶¶ 127–30.
[138] Compl. ¶¶ 16, 49.
[139] Id. ¶ 49.
[140] Id. ¶¶ 128–259.

independence.[141] The Plaintiff relies instead on an assertion of potential liability for these Defendants arising from their role in approving the Transaction.[142]

This is not an insignificant pleading requirement to satisfy. "A simple allegation of potential directorial liability is insufficient to excuse demand, else the demand requirement itself would be rendered toothless, and directorial control over corporate litigation would be lost."[143] Because Wayfair's certificate of incorporation exculpates directors "for monetary damages for breach of fiduciary duty" "[t]o the maximum extent permitted by the Delaware General Corporation Law,"[144] the "[t]he likelihood of directors' liability is significantly lessened."[145] The Plaintiff "'must plead particularized facts showing bad faith in order to establish a substantial likelihood of personal directorial liability.'"[146] "This is a high pleading standard, as Delaware courts typically frame a lack of good faith in terms of 'intentional'

---

[141] According to the Complaint, Conine and Shah acted in concert and formed a control group with regard to the Transaction. *Id.* ¶¶ 138–43. Although Conine's and Shah's status as controlling stockholders would be pertinent to the standard of review under Rule 12(b)(6), it does not affect the demand futility analysis "without particularized allegations of relationships between the [Audit Committee members] and [Conine and Shah] demonstrating that the [Audit Committee members] are beholden to [Conine and Shah]." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1054 (Del. 2004). The Plaintiff has not attempted such a demonstration here.

[142] Pl.'s Answering Br. at 46–58; Compl. ¶¶ 127–30.

[143] *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011).

[144] Fedechko Decl., Ex. 10 Art. VIII § A.

[145] *Goldman Sachs*, 2011 WL 4826104, at *18.

[146] *Id.* (quoting *In re Dow Chem. Co. Derivative Litig.*, 2010 WL 66769, at *12 (Del. Ch. Jan. 11, 2010)).

misconduct."[147]  "Importantly, where (as here) there is no adequate pleading of conflicted interests or lack of independence on the part of the [members of the Audit Committee], the scienter requirement compels that a finding of bad faith should be reserved for situations where the nature of [the Audit Committee members'] action[s] can in no way be understood as in the corporate interest."[148]  "Thus conceived, bad faith is similar to the much older fiduciary prohibition of waste, and like waste, is a *rara avis*."[149]

The Plaintiff contends that the members of the Audit Committee acted in bad faith because they met for only five minutes to approve the Transaction during a break in the full April 5, 2020 Board meeting.[150]  The Plaintiff argues that "[t]he Section 220 Documents demonstrate" that at this meeting, the Audit Committee did not know or attempt to determine the extent of Shah's and Conine's interests in the Transaction counterparties, and could not determine whether the Transaction was "on terms comparable to those that could be obtained in an arm's length transaction."[151]

---

[147] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 63 (Del. Ch. 2015).

[148] *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *29 (Del. Ch. Aug. 31, 2020) (quoting *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *20 (Del. Ch. Mar. 31, 2017)).

[149] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016).

[150] *See* Compl. ¶ 129; Pl.'s Answering Br. at 51.

[151] *See* Compl. ¶ 128–29; Pl.'s Answering Br. at 46–58.

These arguments are unsupported by the Section 220 documents themselves, which are incorporated by reference into the Complaint. First, the Audit Committee resolutions approving the Transaction stated that "there [was] presented to the Committee or provided to the Committee in advance . . . a summary of the process by which the Transaction was identified and negotiated by Goldman Sachs, the Company's financial advisor, members of the Company's management team, and the Transaction Committee."[152] That summary, which Goldman Sachs delivered to the full Board, including Bradley, Naylor and Schäferkordt, *before* the Audit Committee's five-minute meeting, specifically summarized discussions with ten potential investors and compared the key terms of the two lead proposals, including the alternative proposal from Bidder One.[153] The Audit Committee was therefore aware of negotiations conducted with other arm's length bidders, including the key terms of the lead alternative proposal.

Likewise, the Audit Committee resolutions approving the Transaction, which "had been provided in advance to the [Audit] Committee," stated that "two of the

---

[152] *See* Fedechko Decl., Ex. 6 at WAYFAIR-220-0000005. The Court can consider the April 5, 2020 Audit Committee meeting minutes because they are incorporated by reference into the Complaint. *See* Compl. ¶¶ 97, 129.

[153] *See* Fedechko Decl., Ex. 3 at WAYFAIR-220-0000040–41; Ex. 4 at WAYFAIR-220-0000022. The Court can consider these Board presentations at the motion to dismiss stage because they were quoted and cited in the Complaint, and are therefore incorporated by reference. *See* Compl. ¶¶ 80–82, 84, 92, 96. The Complaint also vaguely asserts that unspecified "Section 220 Documents demonstrate" that the Audit Committee was not able to assess whether the Transaction was comparable to an arm's length transaction. *See id.* ¶ 129.

27

Company's directors, Mr. Niraj Shah and Mr. Steven Conine, hold limited partner interests in [Great Hill] and [Charlesbank], and another of the Company's directors, Mr. Michael Kumin, is a member of the managing committee of [Great Hill]."[154] The Audit Committee was thus aware of the nature of Shah's and Conine's interests in the Transaction counterparties.

The Plaintiff argues that the Audit Committee should have asked for more information regarding the Transaction and Shah's and Conine's interests in the counterparties.[155] Perhaps, but not pertinent. These arguments, at most, support a breach of the duty of care. The failure to become fully informed before making a decision is not, on its own, bad faith.[156] Instead, the Plaintiff must plead with

---

[154] *See* Fedechko Decl., Ex. 6 at WAYFAIR-220-0000004.

[155] The Plaintiff contends, for instance, that the Audit Committee should have asked (i) for the "extent" of Shah's and Conine's ownership interests in the Transaction counterparties, (ii) why a PIPE in the amount of $500 million "was deemed preferable," (iii) whether convertible debt was the best way to raise capital, (iv) whether the offering was likely to provide sufficient capital, (v) the date by which any capital would be needed, (vi) the Company's liquidity position, and (vii) the value of the Company's stock. Pl.'s Answering Br. at 55–58, 57 n.234.

[156] *United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 900 (Del. Ch. 2020) (allegations that committee was, among other things, "not fully informed" "allege a breach of the duty of care" "at most"), *aff'd sub nom. Zuckerberg*, 2021 WL 4344361; *Higher Educ. Mgmt. Grp., Inc. v. Mathews*, 2014 WL 5573325, at *11 n.63 (Del. Ch. Nov. 3, 2014) ("Due to [the Company's] exculpation clause under 8 *Del. C.* 102(b)(7), there would be no recourse for Plaintiffs and no substantial likelihood of liability if the Director Defendants' only failing was that they had not become fully informed."); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367 (Del. 1993) ("reaching an uninformed decision" was a "duty of care" breach), *decision modified on reargument*, 636 A.2d 956 (Del. 1994); *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003) (directors' "mere[] fail[ure] to inform themselves or to deliberate adequately about an issue of material importance to their corporation" constitutes "negligen[ce] or gross[] neglien[ce]"); *In re Answers CorporationShareholders Litig.*, 2014 WL 463163, at *13 (Del. Ch. Feb. 3, 2014) (arguments that independent directors "were deliberately uninformed . . . focus on the care with which the Board executed its duties and do not sustain [a] bad faith claim").

particularity that the Audit Committee members "consciously and intentionally disregarded their responsibilities, adopting a 'we don't care about the risks' attitude concerning" the Transaction.[157]  The Complaint and the Section 220 documents incorporated by reference therein demonstrate that the Audit Committee considered the Transaction with Shah's and Conine's potential conflicts in mind.  The Audit Committee members were also aware of the terms offered by arm's length bidders, including Bidder One, as an alternative to the Transaction.  The allegations that these Directors should have done more falls short of "[k]nowing or deliberate indifference"[158] to the risks posed by the Transaction.  They are insufficient to support an inference that the Audit Committee's actions must have been against the corporate interest, and thus in bad faith.[159]

Accordingly, the Complaint fails to plead that the three members of the Audit Committee face a substantial likelihood of liability for bad faith, such that they could not bring their business judgment to bear to consider the substance of a demand.  And, as discussed above, the Plaintiff does not dispute that Defendant Jung and director Sneed could bring their business judgment to bear to consider a demand.

---

[157] *Walt Disney*, 825 A.2d at 289.

[158] *Id.*  The Plaintiff's citation to *Walt Disney* is not availing.  There, this Court held that the complaint alleged that the directors "failed to exercise *any* business judgment and failed to make *any* good faith attempt to fulfill their fiduciary duties."  *Id.* at 278 (emphasis in original).

[159] *See USG*, 2020 WL 5126671, at *29.

Therefore, at least five of the nine members of the demand Board could have considered a pre-suit demand. Demand is not excused.

## III. CONCLUSION

For the foregoing reasons, the Motions to Dismiss are GRANTED in their entirety. The parties should confer and submit a form of order consistent with this opinion.